**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SCOTT WALKER, Individually and d/b/a**
**Maxwell & Walker Consulting Group, LLC and/or d/b/a**
**Precision Marketing Group, LLC;**
**STEVE SEYMOUR, a/k/a Stephen Seymour,**
**Individually and d/b/a Diamond Consulting**
**and/or d/b/a Precision Marketing Group, LLC; and**
**KIRK D. LADNER, Individually and d/b/a The Ladner Group**
**and/or d/b/a Precision Marketing Group, LLC**                    **PLAINTIFFS**

**VERSUS**                                   **CAUSE NO: 1:14-cv-381-KS-JCG**

**JIMMY WILLIAMSON, Individually and/or**
**as the Director and President of Jimmy Williamson, P.C.**
**and/or d/b/a The Law Office of Michael Pohl, and in Partnership**
**and/or a Joint Venture with Michael Pohl and/or John and Jane**
**Does A-G; JIMMY WILLIAMSON, P.C., Individually and/or d/b/a**
**The Law Office of Michael Pohl, and in Partnership**
**and/or a Joint Venture with Michael Pohl and/or John and Jane**
**Does A-G; MICHAEL A. POHL, Individually and**
**d/b/a The Law Office of Michael A. Pohl, and in Partnership**
**and/or Joint Venture with Jimmy Williamson, Jimmy Williamson, P.C.,**
**and/or John and Jane Does A-G; and**
**JOHN AND JANE DOE A, B, C, D, E, F, AND G**                    **DEFENDANTS**

**FIRST AMENDED COMPLAINT**
**(JURY TRIAL REQUESTED)**

**COME NOW THE PLAINTIFFS,** SCOTT WALKER, Individually and d/b/a Maxwell

& Walker Consulting Group, LLC and/or d/b/a Precision Marketing Group, LLC; STEVE

SEYMOUR, Individually and d/b/a Diamond Consulting and/or d/b/a Precision Marketing

Group, LLC; and KIRK D. LADNER, Individually and d/b/a The Ladner Group and/or d/b/a

Precision Marketing Group, LLC, by and through undersigned counsel, and file this their

Complaint against the Defendants, JIMMY WILLIAMSON, Individually and/or as the Director

and President of Jimmy Williamson, P.C. and/or d/b/a The Law Office of Michael Pohl, and in

Partnership and/or Joint Venture with Michael Pohl and/or John and Jane Does A-G; JIMMY

WILLIAMSON, P.C., Individually and/or d/b/a The Law Office of Michael Pohl, and in

Partnership and/or Joint Venture with Michael Pohl and/or John and Jane Does A-G; MICHAEL A. POHL, Individually and d/b/a The Law Office of Michael A. Pohl, and in Partnership and/or Joint Venture with Jimmy Williamson, Jimmy Williamson, P.C., and/or John and Jane Does A-G; and JOHN AND JANE DOE A, B, C, D, E, F, and G, as follows:

## PARTIES

1.   Plaintiff, SCOTT WALKER, is an adult resident citizen of Ocean Springs, Jackson County, Mississippi.

2.   Plaintiff, STEVE SEYMOUR, a/k/a Stephen Seymour, is an adult resident citizen of Kiln, Hancock County, Mississippi.

3.   Plaintiff, KIRK D. LADNER, is an adult resident citizen of Diamondhead, Hancock County, Mississippi.

4.   PRECISION MARKETING GROUP, LLC, is a Mississippi Limited Liability Company with its principle place of business in Biloxi, Harrison County, Mississippi.  The only Members of Precision Marketing Group, LLC are Scott Walker and Kirk Ladner, each of whom, as noted above, is an adult resident citizen of the State of Mississippi.

5.   Maxwell & Walker Consulting Group, LLC is a fictional entity, under whose name Plaintiff Scott Walker did some business, in the State of Mississippi, related to the subject matter of this Complaint.  Maxwell – Walker Consulting Group, LLC, which is also referenced in this Complaint, was a Mississippi Limited Liability Company that has been dissolved.  Its only Members were Scott Walker and Robbie Maxwell, both of who are residents of Jackson County, Mississippi.

6.   Diamond Consulting is a fictional entity under whose name Plaintiff Steve Seymour did some business related to the subject matter of this Complaint.

2

7. The Ladner Group is a fictional entity under whose name Plaintiff Kirk Ladner did some business related to the subject matter of this Complaint.

8. Unless otherwise specified, references in the Complaint to "Plaintiffs" will be a collective reference to all named Plaintiffs.

9. Defendant, JIMMY WILLIAMSON, is an adult resident citizen of the State of Texas, and a Texas Lawyer in good standing, enrolled in the Texas Bar with Bar Number 21624100, who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Mr. Williamson may be served with process in the manner provided by law.

10. JIMMY WILLIAMSON, P.C. is a Texas Professional Corporation, with its principal place of business located at 4310 Yoakum Blvd, Houston, Texas, 77006, which committed a tort and/or breached contracts in whole or in part in the State of Mississippi. On information and belief, Texas resident Jimmy Williamson, who serves as its designated Registered Agent, Director, and President, is the only member of the Professional Corporation. Jimmy Williamson, P.C. may be served with process in the manner provided by law.

11. MICHAEL A. POHL is an adult resident citizen of the State of Texas, and a Texas Lawyer in good standing, enrolled in the Texas Bar with Bar Number 16086300, who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Mr. Pohl may be served with process in the manner provided by law.

12. The Law Office of Michael A. Pohl is a fictional entity under whose name Defendants Michael Pohl and/or Jimmy Williamson and/or Jimmy Williamson P.C. did some business in the State of Mississippi related to the subject matter of this Complaint.

13. Defendants, JOHN AND JANE DOE A, B, C, D, E, F, AND G, are individuals and/or entities who caused or contributed to the injuries and damages of the Plaintiffs, but whose identities, and the scope of their liability, are presently unknown to the Plaintiffs. Plaintiffs will

amend their Complaint to identify any and all John and Jane Doe Defendants and describe their liability, when their true identities and liability are ascertained.

14. Unless otherwise specified, each reference in the Complaint to "Defendants" will be a collective reference to all named Defendants.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under the provision of Title 28, United States Code § 1332, in that this suit is a civil action between citizens of different States wherein the matter and actual controversy exceeds the sum value of $75,000.00, exclusive of interest and costs.

16. Venue of this civil action is appropriate in this Court pursuant to Title 28, United States Code, § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Mississippi.

## FACTS AND CAUSES OF ACTION

17. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

18. At all material times, Jimmy Williamson, Jimmy Williamson, P.C. and Michael Pohl d/b/a The Law Office of Michael Pohl, were acting as a Partnership, Joint Venture, and/or as Co-Principals with regard to the business of obtaining and representing clients and resolving claims (for profit) arising from the Deepwater Horizon oil spill and British Petroleum's, and/or other tortfeasors', liability therefore.  The original, primary purpose of Williamson and Pohl's Joint Venture / Partnership, which was expressed to the Plaintiffs, was for Williamson and Pohl to represent at least 100 Mississippi businesses with BP oil spill claims.  As noted below, and in Exhibits "3", and "9" through "12" to this Complaint, Williamson and Pohl each referred to the other as his Partner in the business endeavor of representing individuals and entities in the

4

pursuit of BP oil spill claims.  Upon information and belief, John and Jane Doe Defendants A, B, C, D, E, F, and G were also involved in said Partnership and/or Joint Venture, but their true identities and liability are at present unknown.

19. Pohl and Williamson / Jimmy Williamson, P.C. had an agreement to share any losses or liabilities incurred, and to share any profits earned, if any, through the endeavors of the Joint Venture / Partnership described in the preceding paragraph.  That agreement is evidenced by the express terms of thousands of contracts signed by individuals and/or entities who hired Pohl and Williamson / Jimmy Williamson, P.C. to pursue BP claims, and/or supplied necessary information for prosecuting those claims, as a direct and proximate result of Plaintiffs' services under the subject contracts. (See "Tab A" to "Exhibit 3" to this Amended Complaint, which is a representative Contract); and by numerous communications and emails by and between the Plaintiffs and the Defendants.

20. Both Pohl and Williamson / Jimmy Williamson, P.C. had a right to participate in the control of the business of the Partnership / Joint Venture, as evidenced by numerous emails and communications by and between Pohl and/or his office staff / authorized representatives and/or Williamson and/or his office staff / authorized representatives, on the one hand, and Plaintiffs, on the other hand; whereby Pohl and Williamson each participated in directing the activities of the Plaintiffs in conducting the business of the Partnership / Joint Venture.

21. Pohl and Williamson / Jimmy Williamson, P.C. had an agreement to each contribute money and/or property to the business of their Partnership / Joint Venture, as evidenced by the express terms of thousands of contracts signed by individuals and/or entities who hired Pohl and Williamson / Jimmy Williamson, P.C. to pursue BP claims, and/or supplied necessary information for prosecuting those claims, as a direct and proximate result of Plaintiff's public relations related services.  (See "Tab A" to "Exhibit 3" to this Amended Complaint, which is a

representative contract)   Those contingency fee contracts called for the Partnership / Joint Venture to advance all expenses necessary to pursue the claim(s), but to only recover such expenses to the extent a recovery was made on the Claimant's behalf; and provided for Pohl and Williamson to share in any fees generated by the representation of BP claimants.   Additionally, the express terms of numerous Joint Venture Agreements between Pohl and Williamson, on one hand; and various Mississippi attorneys who entered into Joint Ventures with Pohl and Williamson to carry out the business of Pohl's and Williamson's Partnership for specific claims, on the other hand, provided that Pohl and Williamson would pay all expenses related to prosecution of those specific BP claims; and share in any fees generated thereby.   As shown below, those Joint Ventures were created as a direct and proximate result of Plaintiffs' services under the subject contracts.

22. Pohl directly paid many expenses related to the business of the Partnership / Joint Venture, including but not limited to the costs of leasing and furnishing an office in Gulfport, Mississippi for the Plaintiffs to use as the center of operations for public relations services rendered pursuant to the July 15, 2012 Contract at issue in this lawsuit (as well as other services for Pohl unrelated to the contracts at issue in this lawsuit).   Pohl referred to that Gulfport, Mississippi office, located in the Hancock Bank building, as Pohl's "satellite law office in Gulfport."   In approximately March, 2014, Pohl relocated his "Mississippi Office" to a location on Cedar Lake Road in Biloxi, Mississippi.   Pohl kept his "Mississippi Office", which was utilized as the center of operations for the Partnership between Pohl / Williamson and Jimmy Williamson, P.C., in operation through at least October 10, 2014.   (See emails attached as "Exhibit 1", the first of which bears the "subject": "Gulfport Law Office").

23. Williamson also directly paid many expenses related to the business of the Partnership / Joint Venture (which Plaintiffs were contracted to perform services for), including but not

limited to commercial and/or charter plane fare, and executive car / driver / rental car services, for Plaintiffs to travel to various places to perform the contracted for public relations services, and/or for Williamson to make multiple trips to Mississippi to meet with prospective Mississippi clients seeking representation on their BP oil spill claims and/or Mississippi attorneys looking to possibly associate Williamson and Pohl in the prosecution of such claims; which meetings were arranged for and set up by the Plaintiffs.

24. At all times relevant to this matter, Defendants, Michael Pohl, Jimmy Williamson and Jimmy Williamson, P.C., and each of them, directly participated in the torts against the Plaintiff.

25. Upon information and belief, at all times relevant to this matter, Defendants, Jimmy Williamson and Jimmy Williamson, P.C., and each of them, had the right to direct and control, and did direct and control, and/or jointly participated with Pohl in controlling, Pohl's actions with regard to entering into and fulfilling contractual obligations under the subject contracts; and other non-enumerated rights controlling the business and conduct of Defendant Michael Pohl and/or the Partnership / joint venture between Pohl and Williamson.

26. Alternatively, at all relevant times, Defendants, Jimmy Williamson and Jimmy Williamson, P.C., and each of them, were Co-Principals with each other and Michael Pohl d/b/a The Law Office of Michael Pohl, and/or Pohl was in an agency relationship with Jimmy Williamson and/or Jimmy Williamson, P.C., regarding the fulfillment of obligations under the subject Contracts and/or promises, and Jimmy Williamson and Jimmy Williamson, P.C., and each of them, directly participated in the torts against the Plaintiffs.

**The May 25, 2012 Contracts**

27. In early April, 2012, Michael Pohl (who Scott Walker had never met before) arranged a meeting and introduction with Scott Walker.  During this meeting, which took place in Pascagoula, Mississippi, Michael Pohl told Scott Walker that Pohl had "partnered with 30 year

friend Jimmy Williamson" to represent companies, entities and people affected by the BP Oil

Spill.  Pohl told Walker that Williamson was "one of ten attorneys who settled the 7.8 billion

dollar claim against BP"; and explained that Pohl and Williamson had a "goal of representing

100 Mississippi companies" in their BP oil spill claims.  Pohl told Walker that Pohl and

Williamson wanted to retain Walker's services to help Pohl and Williamson meet their goal of

representing 100 Mississippi companies in their claims against BP.  Walker (and his then partner

Robbie Maxwell) agreed to provide public relations and marketing services to aid in this

endeavor.

28. Williamson took a private charter flight to Mississippi, where he and Pohl met with

Walker and a representative of the Mississippi Gulf Coast seafood industry for dinner at the

Private Wine Room at Ruth's Chris in Biloxi on April 23, 2012.

29. Walker introduced Pohl to Steve Seymour on or about May 8, 2012, and Seymour also

began providing some marketing / public relations services to Pohl and Williamson with regard

to representing Mississippi individuals and/or entities who were seeking representation in claims

or potential claims against BP.  Walker's and Seymour's public relations / marketing services

were so successful that Pohl agreed (on behalf Pohl and Williamson) to enter into a formal

written contract with them for those services.

30. On or about May 22, 2012, Walker and Seymour met with Pohl at the Hampton Inn on

the beach in Biloxi, Mississippi to discuss the terms of contracts to provide public relations and

marketing services to Pohl and Williamson.  Pohl asked Walker and Seymour if they would be

willing to include Terry Robinson as a service provider in the contracts, and Walker and

Seymour agreed to add Robinson as a party to the contracts at Pohl's request.  At some point

between this meeting and May 25, 2012, while in Mississippi, Michael Pohl called his assistant,

Mazie Arnold, in Walker's presence; and Pohl dictated the language of contracts for Walker,

Seymour and Robinson to provide public relations services related to the BP oil spill.  On May 25, 2012, in Gulfport, Mississippi, Pohl presented Walker with two written contracts for Walker (d/b/a Maxwell & Walker Consulting Group, LLC), Seymour (d/b/a Diamond Consulting) and Robinson (d/b/a Robinson Holdings, LLC) to provide public relations services re: the BP oil spill. (hereinafter these two agreements, which are attached as "Exhibit 2", will be collectively referred to as "the May 25, 2012 Contracts")  This meeting and presentation took place at the airport in Gulfport, Mississippi.   In Walker's presence, Pohl signed the May 25, 2012 Contracts in Gulfport, Mississippi.  Pohl watched Walker sign the May 25, 2012 Contracts in Gulfport, Mississippi; and Pohl directed Walker to get the May 25, 2012 Contracts signed by Seymour and Robinson.  Walker left the airport in Gulfport and drove to Jackson, Mississippi to meet Steve Seymour, where Seymour signed the May 25, 2012 Contracts on May 25, 2012 in the lobby of the Marriott Hotel on County Line Road.  Walker called Robinson on his way to Jackson; and Robinson asked Walker to endorse the May 25, 2012 Contracts on his behalf since Robinson was in Gulf Shores, Alabama.  Pursuant to Robinson's instructions and authorization, which was confirmed to Walker in writing, Walker initialed the May 25, 2012 Contracts on Robinson's behalf in Mississippi on or about May 25, 2012.

31. Michael Pohl drafted and executed the May 25, 2012 Contracts in the State of Mississippi, in furtherance of the business of the BP oil spill representation Partnership and/or Joint Venture Pohl had with Jimmy Williamson, Jimmy Williamson, P.C. and presently unidentified John and Jane Doe Defendants.  These Contracts remained in full force and effect through July 15, 2012.

32. Pursuant to the terms of the May 25, 2012 Contracts, Walker (d/b/a Maxwell & Walker Consulting Group, LLC), Seymour (d/b/a Diamond Consulting) and Robinson (d/b/a Robinson Holdings, LLC) were retained to provide public relations services, in the State of Mississippi and

elsewhere, designed to help the Partnership / Joint Venture of Michael Pohl, Jimmy Williamson,

Jimmy Williamson P.C. and presently unidentified John and Jane Doe Defendants, obtain,

represent, service and maintain clients who wished to pursue claims arising from the Deep Water

Horizon oil spill.

33. Those services included, but were not limited, to facilitating meetings in the State of

Mississippi between Pohl and/or Williamson and representatives of Mississippi businesses,

Mississippi entities, Mississippi Counties, Cities and Municipalities, and/or Mississippi resident

individuals looking for representation in their BP claims (all of which were initially

administrative claims).  Pohl repeatedly traveled to Mississippi for these meetings, and would

generally stay either at Walker's guest house in Ocean Springs, Mississippi or one of the

Mississippi Gulf Coast Casinos.  Williamson also made numerous trips to Mississippi to meet

with prospective clients who were perceived to have particularly large claims (including but not

limited to such entities as the City of D'Iberville, the City of Gulfport, Ingall's Shipbuilding, the

Gulfport Biloxi International Airport, Habitat for Humanity, Jimmy Levens Builders, and many

other large Mississippi businesses and/or entities).  During these meetings, in Mississippi,

Williamson put on power point presentations about the advantages of hiring Williamson and

Pohl to handle BP claims.

34. Another service provided by Plaintiffs pursuant to the May 25, 2012 contracts was to

make introductions and provide public relations services related to facilitating Mississippi law

firms and/or Mississippi lawyers associating Pohl and Williamson to joint venture in the

representation of specific Mississippi individuals and/or entities with BP oil spill claims.  For

example, Walker and Seymour set up a dinner meeting between Pohl, Walker, Seymour, the

Stone County, Mississippi Supervisors and the Stone County Attorney at Vrazel's in Gulfport,

Mississippi on June 10, 2012.  During this meeting, it was agreed that Stone County's attorney

would Joint Venture with Pohl and Williamson in the representation of Stone County, Mississippi on Stone County's BP claim. A "BP Client Representation – Joint Venture Agreement" between Pohl, Williamson and Stone County's attorney was prepared by Stone County's attorney, in Mississippi, as a result of that meeting. The terms of that Joint Venture Agreement required Pohl and Williamson to advance all expenses associated with the representation, to be recovered only to the extent a recovery was made on behalf of Stone County, and to share in any fees generated thereby.

35. Additionally, Plaintiffs made introductions and performed public relations services necessary to facilitate a Joint Venture between Williamson, Pohl and Ben H. Stone, Esquire / Balch & Bingham, L.L.P.. Walker set up several meetings between Williamson and/or Pohl, and Ben Stone, in the 2nd Floor Conference Room of Balch & Bingham, at Balch & Bingham's offices in Gulfport, Mississippi in June, 2012. During these meetings in Gulfport, Mississippi, which were attended and facilitated by Walker, the Partnership of Williamson (individually and on behalf of Jimmy Williamson, P.C.) and Pohl (individually and on behalf of the Law Offices of Michael A. Pohl), on the one hand, and Ben Stone (as Managing Partner of Balch & Bingham, L.L.P.), on the other hand, agreed to enter into a "Joint Venture Agreement" whereby Balch / Bingham agreed to "refer to Williamson/Pohl at their discretion certain clients who have potential claims arising from or related to the BP oil spill of April 20, 2010." It was agreed that Williamson/Pohl would "assume all day to day responsibility for processing and/or litigating the claims" and that "all attorneys' fees" would be "divided between Williamson/Pohl and Balch/Bingham fifty-fifty." On June 28, 2012, Pohl advised Williamson that Stone was expected to sign the Joint Venture Agreement that day, and advised that Pohl would co-sign at that time. Pohl asked Williamson "you want me to sign for you or wait till your (sic) here next week", to which Williamson replied and authorized / directed Pohl to sign the Joint Venture Agreement on

Williamson's behalf.  (See email string dated June 28, 2012; and fully executed "Joint Venture Agreement" signed by Pohl on his and Williamson's behalf in the State of Mississippi on June 28, 2012, attached as "Cumulative Exhibit 3").

36. Plaintiffs also facilitated a meeting between Williamson, Pohl and some other Mississippi attorneys to Joint Venture in the representation of approximately 200 BP oil spill claimants who had already obtained the services of Mississippi representatives.  Walker arranged a meeting between Mississippi attorneys representing that interest and Williamson and Pohl.  Williamson and Pohl flew to Mississippi, and attended that meeting, at Mary Mahoney's in Biloxi, Mississippi, on or about May 25, 2012.  From this meeting came additional Joint Venture agreements with Mississippi law firms, wherein the Partnership of Pohl and Williamson entered into Joint Ventures with Mississippi attorneys to represent BP oil spill claimants.  The terms of these agreements required Williamson and Pohl to share in potential losses (expenses in contingency fee contracts) and profits (fees) arising from the representation of BP clients.

37. Another service provided by Plaintiffs pursuant to the May 25, 2012 Contracts, pursuant to the request of the Defendants, was assisting in the recruitment and training of additional public relations and investigatory contractors; which contractors were ultimately hired by, and which were to be paid (directly or indirectly) by Pohl, on behalf of the Partnership between Pohl and Williamson.

38. In exchange for the services described in the preceding paragraphs, Pohl, on behalf of the Partnership / Joint Venture between Pohl, Williamson, Jimmy Williamson, P.C. and John and Jane Doe Defendants, promised to pay hourly fees plus expenses.  Pohl promised the Plaintiffs, on behalf of the Defendants, to provide compensation for services provided pursuant to the May 25, 2012 Contracts; or alternatively (in the absence of an enforceable contract) for the services described in the preceding paragraphs, in the amount of $1,500 per hour (for the collective

services of all signees to the Contracts).  Due to the nature and extended hours of the work, Pohl, on behalf of the Defendants, agreed that the hourly rate of $1,500 an hour would be calculated, and paid on behalf of the Defendants, based upon ten (10) hour days, seven (7) days a week. Pohl also agreed, on behalf of the Partnership between Pohl and Williamson, to reimburse Plaintiffs' out of pocket expenses incurred in relation to services provided for the Defendants.

39. It was agreed between Pohl, on behalf of all Defendants, and the Plaintiffs that the total amount of hourly fees paid to the Plaintiffs pursuant to the terms of the May 25, 2012 Contract would be split with 40% of fees being paid to Maxwell & Walker Consulting Group, LLC / Scott Walker; 40% of the fees being paid to Diamond Consulting / Steve Seymour; and 20% of the fees being paid to Robinson Holdings, LLC / Terry Robinson.  The May 25, 2012 Contracts expressly referenced the Partnership / Joint Venture between Williamson and Pohl, referred to therein as "the British Petroleum representation agreement between Jimmy Williamson, P.C. and the Law Office of Michael Pohl."

40. Although the terms of the Contracts drafted by Pohl (in Mississippi) on behalf of all the Defendants suggest a fee splitting agreement between the lawyer Defendants and non-lawyer Plaintiffs; Plaintiffs' rights to collect hourly fees and expenses is not contingent upon Defendants making any recovery on behalf of Defendants' BP oil spill clients and/or otherwise limited or affected by the amount of Defendants' recovery, if any.  Any attempt by Defendants to so calculate Plaintiffs' compensation is unenforceable as a matter of law.  Pohl, on behalf of all the Defendants, acknowledged and ratified the unenforceability and/or inapplicability of any clause or sentence in the subject Contracts that purports to impose such a limitation and/or calculation method through acceptance of Plaintiffs' services; acceptance of invoices for Plaintiffs' services at the rate of $1,500 per hour, and partial payments for Plaintiffs' services, as described herein.

41. At all material times Plaintiffs fulfilled all the services requested by the Defendants and/or all their obligations under the terms of the May 25, 2012 Contracts.  Although the May 25, 2012 "Public Relations Consulting Agreement" states "All consultants shall keep accurate daily time records of all efforts expended on behalf of [Defendants]", Pohl, on behalf of all Defendants, acknowledged and ratified that Plaintiffs were not required by Defendants and/or the subject Contracts to keep detailed daily and/or hourly time records.  At all times, Plaintiffs kept and provided all time records Pohl, on behalf of all Defendants, required and/or deemed necessary under the terms of the May 25, 2012 Contracts.

42. Alternatively, Pohl's actions, on behalf of all Defendants, in accepting and paying hourly invoices without detailed daily and/or hourly time records constitutes a waiver of the "accurate daily time records" provision of the May 25, 2012 Contracts and any implied duty to maintain same, if any.

43. Additionally, and in the alternative, Plaintiffs, and each of them, materially and substantially changed their positions, gave up other employment opportunities, and spent many days and nights away from their families to devote huge quantities of their time to performing the services requested by Defendants in reliance on Pohl's, on behalf of all the Defendants, promises of payment described above.  However, Defendants have not compensated Plaintiffs for those services in the manner promised by the Defendants.

44. As a direct and proximate result of Plaintiffs' efforts in fulfilling their contractual duties under the May 25, 2012 Contracts and/or in performing the services requested by Defendants, in exchange for Pohl's, on behalf of all the Defendants, promises to pay the amounts described above, approximately one thousand one hundred and twenty seven (1,127) individuals and/or entities chose to be represented by Defendants, Jimmy Williamson, Jimmy Williamson, P.C. and Michael Pohl, and/or those Defendants and Mississippi counsel with whom they entered into

14

Joint Venture agreements pursuant to Plaintiffs' services, in efforts to recover compensation from BP and/or other responsible parties arising from damages caused by the Deepwater Horizon oil spill.   The vast majority of those represented claimants were comprised of Mississippi businesses, Mississippi entities and individual Mississippi residents.

45. Pohl, on behalf of all the Defendants, initially requested that the May 25, 2012 Group defer invoicing and collection of fees earned under the May 25, 2012 Contract for a period of time.   The May 25, 2012 Group agreed to defer invoicing and collection efforts as an accommodation to Defendants.   In return for Plaintiffs' agreements to defer invoicing and collection of hourly fees due and owing under the May 25, 2012 Contracts, and/or in recognition of the extraordinary efforts expended by Plaintiffs in performing services for the Defendants, Pohl, on behalf of all Defendants, made periodic payments of money to Plaintiffs, and each of them.   These payments, which were referred to variously as "advances" and/or "retainers" and/or by various other specifications, were in reality bonuses and/or additional compensation, outside the terms of the May 25, 2012 Contracts.   By acceptance of subsequent invoices for hourly fees for work done pursuant to the subject contracts, and payment of same without seeking credit and/or applying offsets for the aforementioned payments, Pohl, on behalf of all Defendants, acknowledged and ratified that those payments (which were not made in response to any invoice for hourly services) were extra-contractual compensation for which Defendants are not entitled to any credit or offset against hourly fees due under the May 25, 2012 Contracts.

46. Thereafter, between approximately February, 2013 and August, 2013, Pohl, on behalf of all Defendants, requested the May 25, 2012 Group to issue periodic invoices for specific numbers of hours (at the agreed upon rate of $1,500 an hour) directed by Pohl, without any documentation of the specific dates on which those hours were worked.   Pohl's request was complied with by the Plaintiffs, and 8 such periodic invoices seeking compensation for specific

numbers of hours (at the agreed upon rate of $1,500 an hour) as directed by Pohl were issued by Plaintiffs (through Precision Marketing Group, LLC).  Each of those invoices was accepted and paid by Pohl, on behalf of all Defendants; thereby ratifying, on behalf of the Defendants and their Partnership / Joint Venture, Defendants' agreement to pay the May 25, 2012 Group $1,500 an hour for their services without any detailed itemization of daily and/or hourly time records. Invoices 1 through 6 were paid by Pohl, on behalf of all Defendants, by check, delivered to Plaintiffs' offices in Mississippi; and invoices 7 and 8 were paid by Pohl, on behalf of all Defendants, through a wire transfer to a bank account in Gulfport, Mississippi.  A total of $59,750 was paid to the May 25, 2012 Group pursuant to these invoices, however no payment has been made for services due under the May 25, 2012 Contract since August 23, 2013.

47. It is presently unknown whether Pohl, on behalf of all the Defendants, was asking for "hour specific" invoices in order to manipulate payments as recoverable expenses under specific BP claims resolutions; or whether Defendants, or any of them, charged these fees, or any portion thereof, as "expenses" to their BP clients and/or in connection with Common Benefit costs submitted for reimbursement through the Plaintiffs' Steering Committee (PSC) of the Deepwater Horizon BP Oil Spill multi-district litigation.  Defendants' contingency fee agreements for representation of BP Oil Spill Claimants each contained a provision that provided "**Client shall receive no credit or offset for any Common Benefit fees or costs awarded.** (See "Tab A" to "Exhibit 3" to this Amended Complaint, which is a representative Contract) (emphasis in original)

48. After Defendants failed to honor and refused to pay the remaining contractual obligations under the May 25, 2012 Contract, Defendants and Robinson Holdings / Terry Robinson entered into an agreement to resolve all claims that Robinson Holdings / Terry Robinson had against the Defendants arising from Defendants' breach of the May 25, 2012 Contracts.  Nothing about that

resolution or settlement resolved the claims of Scott Walker, d/b/a Maxwell & Walker Consulting Group, LLC and/or Precision Marketing Group, LLC and Steve Seymour, d/b/a Diamond Consulting and/or d/b/a Precision Marketing Group, LLC; nor did these Plaintiffs authorize Robinson Holdings / Terry Robinson to negotiate on their behalf and/or bind them to any settlement resolution.   Although an individual settlement was allegedly reached with Robinson; it was not ratified nor participated in by, nor is it enforceable against, these Plaintiffs.

49. For the period of time May 25, 2012 through July 15, 2012 the members of the May 25, 2012 Group are entitled, pursuant to the subject contracts and the express representations and promises of Pohl, on behalf of all Defendants, to be compensated for 520 hours at the rate of $1,500 an hour, plus reimbursement of out of pocket expenses.   Defendants were thus required to compensate the Plaintiffs with the sum of $780,000, plus expenses, under the terms of the May 25, 2012 Contracts.   Giving credit for the 20% of said fees the May 25, 2012 Contracts apportioned to Robinson Holdings, LLC / Terry Robinson (in light of that party's alleged settlement and release of his / its individual claims and potential claims against these Defendants arising out of said Contract), and for 80% (these Plaintiffs' designated share) of the periodic payments totaling $59,750, the total amount of hourly fees due to Plaintiff Scott Walker, d/b/a Maxwell & Walker Consulting Group, LLC and/or Precision Marketing Group, LLC and Steve Seymour, d/b/a Diamond Consulting and/or d/b/a Precision Marketing Group, LLC, to be split evenly between them pursuant to the apportionment spelled out in the Contract and/or agreed upon by the parties, is $576,200, plus reimbursement of expenses. Defendants have failed and refused to pay these amounts, which are due and owing under the May 25, 2012 Contracts; and/or which were promised to Plaintiffs by Pohl, on behalf of all Defendants, in exchange for the services Plaintiffs materially changed their positions to render in reliance thereon.

**The July 15, 2012 Contract**

50. Toward the end of June, 2012, Walker introduced Williamson to Kirk Ladner at the Silver Slipper Casino in Bay St. Louis, Mississippi.  Williamson was impressed with Ladner, and wanted to retain him to also provide public relations and/or marketing services on behalf of Williamson / Jimmy Williamson, P.C. / Pohl.  Defendants initially hired Ladner to provide some public relations / marketing services on a limited per service basis.  In early July, 2012, Pohl told Walker that Defendants wanted to end the relationship with Terry Robinson, and agreed to enter into a new contract that included Kirk Ladner.  The terms of the contract were negotiated in Mississippi, and the contract was drafted by Pohl in furtherance of the business of the BP oil spill representation Partnership and/or Joint Venture that Pohl had with Jimmy Williamson, Jimmy Williamson, P.C. and presently unidentified John and Jane Doe Defendants.

51. On or about July 31, 2012, Pohl, on behalf of the Defendants, and Walker, Seymour and Ladner, individually and/or all d/b/a Precision Marketing Group, LLC (hereinafter "the July 15, 2012 Group"), signed a contract for Plaintiffs to provide public relations services for Pohl's and Williamson's BP oil spill claims Partnership.  Again, the primary purpose of Pohl's and Williamson's Partnership, as represented to Walker, was to represent at least 100 Mississippi businesses in their BP oil spill claims.  The contract was signed by all parties at the Biloxi – Gulfport International Airport in Gulfport, Mississippi, on or about July 31, 2012.  (hereinafter referred to as "the July 15, 2012 Contract").  (A copy of the July 15, 2012 Contract is attached and incorporated as "Exhibit 4").  Pohl, on behalf of the Defendants, chose to date the Contract as being effective on July 15, 2012.

52. Although the July 15, 2012 Contract drafted by Pohl makes a passing reference to "the Public Relations Consulting Agreement" (solely in respect to the inoperable and unenforceable attorney fee splitting provision), no such separate agreement was ever entered into by and

between Defendants, or either of them, and the Members of the July 15, 2012 Group. No contract containing a provision requiring "accurate daily time records", or any time records, was ever entered into by and between Defendants, or any of them, and the July 15, 2012 Group.

53. The terms of the July 15, 2012 Contract (titled "Operating Agreement") that Pohl executed, in furtherance of the business of the BP oil spill representation Partnership and/or Joint Venture Pohl had with Jimmy Williamson, Jimmy Williamson, P.C. and presently unidentified John and Jane Doe Defendants, in Mississippi on July 31, 2012 are substantially similar (with the names of parties and percentages changes) to the May 25, 2012 "Operating Agreement" Pohl negotiated and drafted in the State of Mississippi between May 22 and May 25, 2014. The July 15, 2012 Contract remains in force.

54. Pursuant to the terms of the July 15, 2012 Contract, the July 15, 2012 Group were retained to provide public relations services, in the State of Mississippi and elsewhere, designed to help the Partnership / Joint Venture of Michael Pohl, Jimmy Williamson, Jimmy Williamson P.C. and presently unidentified John and Jane Doe Defendants, obtain, represent, service and maintain clients who wished to pursue claims arising from the Deep Water Horizon oil spill.

55. Those services included, but were not limited, to facilitating meetings in the State of Mississippi between Pohl and/or Williamson and representatives of Mississippi businesses, Mississippi entities, Mississippi Counties, Cities and Municipalities, and/or Mississippi resident individuals looking for representation in their BP claims (all of which were initially administrative claims). Pohl and Williamson made numerous trips to Mississippi to meet with prospective clients in meetings that were orchestrated and facilitated by the Plaintiffs.

56. Part of Plaintiffs' services under the July 15, 2012 Contract included distributing leather bound wire ring folders to potential BP claimants looking for representation on their BP claims. These leather binders, the first approximately 50 of which were prepared and put together by

Jimmy Williamson's office and which Williamson delivered to Plaintiffs in Mississippi and directed Plaintiffs to distribute to prospective BP clients in Mississippi, had a "cover" with a color picture of the Deepwater Horizon topped by "Michael A. Pohl Attorney at Law."  When the binder was opened, it contained a business card of Jimmy Williamson in the bottom, left hand corner of the inside of the cover.  The first document in the binder was a letter dated August 1, 2012 on Williamson's letterhead, signed by Williamson.  The letter, which was addressed "To Whom it May Concern", confirmed the Joint Venture / Partnership between Williamson and Pohl to represent BP oil spill claimants.  The letter begins by stating, beginning in the second paragraph:

> **We** are available to represent individuals or businesses for claims against British Petroleum for economic losses sustained as a result of the April 20, 2010 Deepwater Horizon oil spill disaster.  **We** traditionally represent clients on a contingency basis, advance all litigation expenses associated with prosecuting claims, and no fees or expenses are due, unless, and until, there is a recovery of a claim.

> Attached hereto is **our** contract of employment. (Tab A).

(See copy of complete binder attached hereto as "Exhibit 5") (emphasis added).  The "our contract", attached to the binder as "Tab A" to Williamson's letter, is a contingency fee contract for prospective BP claimants to be jointly represented by "Jimmy Williamson, P.C." and "Michael A. Pohl", who are jointly identified in the representative contract as "Attorney".  *Id.* Williamson's letter also makes numerous references to the types of oil spill claims "We" [Williamson and Pohl] jointly represent. *Id.*  Williamson's and Pohl's contingency fee contract makes it clear that Williamson and Pohl will share in any losses and/or profits related to their Joint Venture / Partnership; and requires any and all sums recovered on the clients' behalf to be paid to Jimmy Williamson for disbursement.  "Tab B" to Williamson's letter contains the professional resumes of Williamson and Pohl.  *Id.*

57. The services provided by Plaintiffs pursuant to the July 15, 2012 Contract, and/or in reliance on the promises of payment made by Pohl on behalf of all Defendants, included both providing public relations services to prospective Williamson / Pohl clients who were seeking representation on their BP oil spill claims; and servicing those individuals who had already signed contracts to be represented by Pohl / Williamson.  For example, Williamson advised Walker, by email dated August 13, 2012, that all BP clients would have to sign a Power of Attorney giving Williamson / Pohl power of attorney to represent their interest, and directed Walker to "make sure this is done on every new case signed and we are going to have to get it on every prior case that has been signed up."  In a string of emails by and between Walker and Williamson, copied to Pohl, dated between November 7, 2012 and November 19, 2012, Williamson sought ideas on finalizing representation of a multi-million dollar BP client that had expressed interest in possibly being represented by Williamson / Pohl. Williamson concluded the email string by acknowledging the hours being put in across the board on these endeavors, asking Plaintiff to limit requests on Williamson's secretary, who was "working 7 days a week." In a string of emails by and between Walker and Williamson (and copied to Pohl) between December 10 and December 12, 2012, Williamson asked Walker to gather and provide information that would help prove damages on a multi-million dollar BP claim in Mississippi; and discussed how to gather similar information for other large dollar claims.  In a string of emails starting January 3, 2013, Williamson gave Walker and Ladner marching orders regarding travel to Chicago, Illinois to gather time sensitive claims information from a client with a multi-million dollar BP claim.

58. Plaintiffs also provided services related to facilitating joint venture agreements between Williamson / Pohl and other attorneys / groups for the representation of BP oil spill claimants under the July 15, 2012 Contract.  For example, in a September 3, 2012 email sent at 5:47 p.m.,

Walker advised Williamson and Pohl he was trying to set up a meeting with an accounting firm in Gulfport, Mississippi that was interested in possibly associating Williamson and Pohl to represent about 80 clients.  By return email at 9:47 that night, Williamson responded "Sweet. Happy to do it this week."

59. Plaintiffs also facilitated a meeting between representatives of the City of D'Iberville and Jimmy Williamson and Michael Pohl, in approximately September, 2012.  Following that meeting, on or about September 17, 2012 Walker picked up a Joint Venture Agreement for Williamson and Pohl to jointly represent the City of D'Iberville with the City Attorney; with Williamson / Pohl to advance all expenses, which had been signed by the Attorney for the City of D'Iberville.  Walker then delivered the Joint Venture Agreement to Williamson and Pohl for their signatures.

60. Plaintiffs also facilitated negotiations for a Joint Venture Agreement between the Illinois Restaurant Association in early September, 2012.  When the Joint Venture Agreement had not been signed as of early October, Defendants had Plaintiffs, on Defendants' behalf, offer the Association a "signing bonus" in the form of "a donation in the amount of 20% of the legal fees derived from [the Joint Venture between the Association and Williamson / Pohl.]"  The "Charitable Contribution" Agreement that memorialized that offer was prepared by the Defendants.  (See email string and documents attached as "Cumulative Exhibit 6").

61. Another service provided by Plaintiffs pursuant to the July 15, 2012 Contract, pursuant to the request of the Defendants, was assisting in the recruitment and training of additional public relations and investigatory contractors, which contractors were ultimately hired by, and which were to be paid (directly or indirectly) by Pohl, on behalf of the Partnership between Pohl and Williamson.

62. In exchange for the services described in the preceding paragraphs, Pohl, on behalf of the Partnership / Joint Venture between Pohl, Williamson, Jimmy Williamson, P.C. and John and Jane Doe Defendants, promised to pay hourly fees plus expenses.  Pohl promised the Plaintiffs, on behalf of the Defendants, to provide compensation for services provided pursuant to the July 15, 2012 Contract; or alternatively (in the absence of an enforceable contract) for the services described in the preceding paragraphs, in the amount of $1,500 per hour (for the collective services of all signees to the Contracts and their employees).  Due to the nature and extended hours of the work, Pohl, on behalf of the Defendants, agreed that the hourly rate of $1,500 an hour would be calculated, and paid on behalf of the Defendants, based upon ten (10) hour days, seven (7) days a week.  Pohl also agreed, on behalf of the Partnership between Pohl and Williamson, to reimburse Plaintiffs out of pocket expenses incurred in relation to services provided under the July 15, 2012 Contracts.

63. It was agreed between Pohl, on behalf of all Defendants, and the Plaintiffs that the total amount of hourly fees paid to the Plaintiffs pursuant to the terms of the July 15, 2012 Contract would be split evenly between Scott Walker, Steve Seymour and Kirk Ladner.  (The contract drafted by Pohl actually uses stated percentages that suggest a fee sharing agreement by and between Defendants and the Plaintiffs –with Plaintiffs to get 7.5% each of Pohl's share of fees earned through his partnership with Williamson, however any such provision has been ratified by Defendants to be invalid and/or unenforceable, as set forth herein)   The July 15, 2012 Contract expressly referenced the Partnership / Joint Venture between Williamson and Pohl, referred to therein as "the British Petroleum representation agreement between Jimmy Williamson, P.C. and the Law Office of Michael Pohl."

64. Although the terms of the Contract drafted by Pohl (in Mississippi) on behalf of all the Defendants suggest a fee splitting agreement between the lawyer Defendants and non-lawyer

Plaintiffs; Plaintiffs' rights to collect hourly fees and expenses is not contingent upon Defendants making any recovery on behalf of Defendants' BP oil spill clients and/or otherwise limited or affected by the amount of Defendants' recovery, if any. Any attempt by Defendants to so limit and/or calculate Plaintiffs' compensation is unenforceable as a matter of law. Pohl, on behalf of all the Defendants, acknowledged and ratified the unenforceability and/or inapplicability of any clause or sentence in the subject Contract that purports to impose such a limitation through acceptance of Plaintiffs' services; acceptance of invoices for Plaintiffs' services, and partial payments for Plaintiff's services, as described herein.

65. At all material times Plaintiffs fulfilled all performed all services requested and required by the Defendants; and/or fulfilled all their obligations under the terms of the July 15, 2012 Contract. No provision of the July 15, 2012 Contract, or any contract or agreement signed by and between Defendants, or any of them, and the July 15, 2012 Group expressly required the Plaintiffs to keep time records of any sort. Pohl, on behalf of all Defendants, acknowledged and ratified that Plaintiffs were not required by any express language and/or implied duty under the subject Contract to keep any daily and/or hourly time records; by accepting and making $150,000 of payments toward hourly invoices without any time records being submitted by the Plaintiffs. At all times, Plaintiffs kept and provided all time records Pohl, on behalf of all Defendants, required and/or deemed necessary under the terms of the July 15, 2012 Contract.

66. Alternatively, Pohl's actions, on behalf of all Defendants, in accepting and making partial payments toward hourly invoices, and accepting receipts showing the amount of the payments credited therefore, without any daily and/or hourly time records, constitutes a waiver of any requirement that might be inferred under the terms of the July 15, 2012 Contract and/or any other allegedly applicable agreement, if any, for Plaintiffs to keep any form of time records related to services performed by the Plaintiffs.

67. Additionally, and in the alternative, Plaintiffs, and each of them, materially and substantially changed their positions, gave up other employment opportunities, and spent many days and nights away from their families to devote huge quantities of their time to performing the services requested by Defendants in reliance on Pohl's, on behalf of all the Defendants, promises of payment described above. However, Defendants have not compensated Plaintiffs for those services in the manner promised by the Defendants.

68. Pohl, on behalf of all the Defendants, initially requested that the July 15, 2012 Group defer invoicing and collection of fees earned under the July 15, 2012 Contract for a period of time. The Plaintiffs agreed to defer invoicing and collection efforts as an accommodation to Defendants. In return for Plaintiffs' agreements to defer invoicing and collection of hourly fees due and owing under the July 15, 2012 Contract, and/or in recognition of the extraordinary efforts expended by Plaintiffs in performing services for the Defendants, Pohl, on behalf of all Defendants, made periodic payments of money to Plaintiffs, and each of them. These payments, which were referred to variously as "advances" and/or "retainers" and/or by various other specifications, were in reality bonuses and/or additional compensation, outside the terms of the July 15, 2012 Contract. By acceptance of subsequent invoices for hourly fees for work done pursuant to the subject contract, and partial payment of same without seeking credit and/or applying offsets for the aforementioned payments, Pohl, on behalf of all Defendants, acknowledged and ratified that those payments (which were not made in response to any invoice for hourly services) were extra-contractual compensation for which Defendants are not entitled to any credit or offset against hourly fees due under the July 15, 2012 Contract and/or pursuant to the promises of the Defendants upon which Plaintiffs relied.

69. As a direct and proximate result of Plaintiffs' efforts in fulfilling their contractual duties under the July 15, 2012 Contract; and/or in performing the marketing and public services

required by Defendants, in exchange for Pohl's, on behalf of all the Defendants, promises to pay the amounts described above; approximately nine thousand, four hundred and eighty six (9,486) additional individuals and/or entities chose to be represented by Defendants, Jimmy Williamson, Jimmy Williamson, P.C. and Michael Pohl, and/or those Defendants and Mississippi counsel with whom they entered into Joint Venture agreements pursuant to Plaintiffs' services, in efforts to recover compensation from BP and/or other responsible parties arising from damages caused by the Deepwater Horizon oil spill.  The vast majority of those represented claimants were comprised of Mississippi businesses, Mississippi entities and individual Mississippi residents.

70. In early January, 2014, Pohl, on behalf of all Defendants, asked the Plaintiffs to provide invoices, broken down on a monthly basis, showing the total amount of hours worked and the total amount of hourly fees due under the July 15, 2012 Contract for the time period July 15, 2012 through December 31, 2013, pursuant to the terms that had been promised and agreed to by the Defendants.

71. Pursuant to Pohl's, on behalf of all Defendants, request, Plaintiffs sent the requested invoices (issued through Precision Marketing Group, LLC) to Pohl on January 21, 2014, which invoices confirmed that for the period of time July 15, 2012 through December 31, 2013 the members of the July 15, 2012 Group are entitled to be compensated by the Defendants for a total of 5,350 hours, at the rate of $1,500 per hour.  The invoices do not contain any detailed time records of hourly or daily work, as such was not required by the Defendants and/or the terms of the subject Contract.  By email dated January 22, 2014, Pohl, on behalf of all Defendants, acknowledged receipt of the July 15, 2012 through December 31, 2013 invoices, and asked Plaintiffs to "keep a running total".  (See email string, and invoices, attached as "Exhibit 7").

72.  Pohl, on behalf of all Defendants, also ratified that the tendered invoices documented numbers of hours and hourly rates that were anticipated and required by the July 15, 2012

Contract and/or the oral agreements between Pohl, on behalf of all Defendants, and the Plaintiffs. On September 9, 2013, Pohl, on behalf of all the Defendants, made a $50,000 payment to Plaintiffs.  After Pohl received the invoices, Pohl, on behalf of all the Defendants, asked Plaintiffs to credit the September 9, 2013 payment toward the Invoice for July 15 – July 31, 2012.  On March 9, 2014, Pohl, on behalf of all Defendants, made an additional $50,000 payment toward the July, 2012 invoice, and asked that it be credited toward the July 15-31, 2012 invoice.

73. By email dated June 2, 2014, Walker confirmed in writing that Pohl had made the above referenced $50,000 payments "toward our hourly fees to me, Kirk Ladner and Steve Seymour." In a responsive email sent the same day, Pohl said "Thanks.  Please send me the receipts as well."  In response, by email dated June 3, 2014, Walker sent Pohl two (2) receipts showing the two $50,000 payments, with each credited against the July 15-July 31 Invoice (which invoice was for 170 hours / $255,000 – the two $50,000 receipts showed respective balances of $205,000 and $155,000).  (See email string and Receipts attached as "Exhibit 8").

74. On or about Sunday, June 1, 2014, Pohl told Seymour, Walker and Ladner that he had retained Chris Flood, a Houston based Texas attorney, to represent certain of Pohl's and Williamson's interests related to the BP oil spill claims process.  Pohl told Plaintiffs that Mr. Flood would be contacting them, and asked Plaintiffs to please talk with Mr. Flood as Pohl's representative.  On or about Wednesday, June 4, 2014, Chris Flood called Steve Seymour on behalf of the Defendants.  During this conversation, Chris Flood repeatedly assured Seymour and the Plaintiffs that the subject Contracts, and the services provided by the Plaintiffs pursuant to same, are legitimate, legal and enforceable; and repeatedly assured Seymour that Seymour, Walker and Ladner were going to be paid what they are owed under the subject Contracts.

27

75. On June 21, 2014, Pohl, on behalf of all Defendants, made a third payment of $50,000 toward the July, 2012 Invoice – leaving a balance due of $105,000 on the July 15 – July 31, 2012 invoice.  No further payments toward the July 15-31, 2012 invoice, or any of the August, 2012 through December, 2013 invoices have been made by Defendants, notwithstanding Pohl's repeated promises and assurances.

76. By accepting the July 15, 2012 through December 31, 2013 invoices, by issuing partial payments and accepting receipts for the credited amounts noted above, Pohl, on behalf of all Defendants, acknowledged and ratified Defendants' (and/or their Partnership / Joint Venture) obligation, promise and agreement to compensate the July 15, 2012 Group for their services at the rate of $1,500 an hour, to be calculated at 7 days a week, 10 hours a day, without any itemization of daily and/or hourly time records.

77. For the period of time July 15, 2012 through December 31, 2013, giving credit for the three (3) $50,000 payments made toward the July 15 - July 31, 2012 invoice, the members of the July 15, 2012 Group are entitled, pursuant to the subject contracts and/or the express representations and promises of Pohl, on behalf of all Defendants, and the reliance of Plaintiffs thereon, to be compensated by the Defendants in the amount of $7,875,000.  Defendants have failed and refused to pay these amounts, which are due and owing under the July 15, 2012 Contract; and/or which were promised to Plaintiffs by Pohl, on behalf of all Defendants, in exchange for the services Plaintiffs materially changed their positions to render in reliance thereon.  Pursuant to Pohl's, on behalf of all Defendants, promises, Plaintiffs are also entitled to recover all out of pocket expenses incurred in providing services requested by the Defendants.

78. It appears that Pohl, on behalf of all Defendants, may have been trying to string Plaintiffs along with only partial payments of monies due under the subject contracts in an effort to allow

applicable statutes of limitation for claims Plaintiffs have against the Defendants to run; and thus avoid paying Plaintiffs the full amount due for the services they rendered.

## **Bad Faith**

79. At all times, Plaintiffs performed all services required by the Defendants, in good faith reliance on Defendants' promises to provide compensation and reimbursements as outlined above.

80. Plaintiffs have not breached any provision of the subject contracts.

81. As recently as June 4, 2014, Defendants, by and through their designated and authorized representative, assured Plaintiffs that Defendants were going to pay Plaintiffs every dollar owed to the them by the Defendants.  On that date, Chris Flood, an attorney Pohl asked Plaintiffs to speak with as Pohl's and Williamson's representative, repeatedly assured Seymour (and the Plaintiffs) that the subject Contracts, and the services provided by the Plaintiffs pursuant to same, are legitimate, legal and enforceable; and repeatedly assured Seymour that Seymour, Walker and Ladner are going to be paid what they were owed under the subject Contracts.  Notwithstanding Defendants' repeated promises of payment, no further payments have been made to the Plaintiffs for the services described in this Complaint.

82. There is no arguable basis for Defendants' failure to pay the Plaintiffs the compensation and reimbursements referenced in this Complaint.

83.  Defendants have reaped, and are expected to continue to reap, substantial benefits (on information, tens of millions of dollars in profits) from the services rendered by the Plaintiffs. Pohl told the Plaintiffs on multiple occasions, including but not limited to a representation made to Walker and Ladner on Monday, January 28, 2013 at Bacchus Restaurant in Gulfport, Mississippi, that "Jimmy [Williamson's] Goal is ONE HUNDRED MILLION DOLLARS in legal fees [from representation of BP claimants obtained and/or serviced in connection with the

public relations services provided by the Plaintiffs]", and that Plaintiffs should expect to earn "over TEN MILLION DOLLARS" from performing the services requested by and contracted for by the Defendants.

84. Defendants, and each of them, knew that Plaintiffs were spending many hours, and working 7 day weeks, at the expense of their family lives and other business endeavors, to perform the services requested by Defendants.   Rather than pay Plaintiffs what they contracted and/or promised to pay, however, Defendants have accused the Plaintiffs of misstating the true facts, and flatly refused to pay Plaintiffs the agreed upon compensation.

85. Defendants' actions and conduct constitutes malice, gross negligence and/or, at a minimum, reckless disregard for the rights of the Plaintiffs, and each of them.

**Other Services Provided by Plaintiffs and/or Entities with which They Were Associated**

86. In addition to services provided pursuant to the May 25, 2012 Contracts and July 15, 2012 Contract; Pohl, on behalf of all Defendants, asked Walker, by and through Maxwell-Walker Consulting Group, LLC and/or Precision Marketing Group, LLC (which was formed pursuant to Pohl's request and which shared office space with Pohl's "satellite Mississippi law office"), to provide administrative services related to the compensation and expense reimbursement of other public relations and investigatory contractors in Mississippi and elsewhere.

87. Pohl asked Walker to handle all administrative services related to paying compensation to public relations and investigator contractors and/or support staff; and reimbursement of related expenses through, first, Maxwell-Walker Consulting Group, LLC; and later Precision Marketing Group, LLC.

88. Initially, Pohl, on behalf of Defendants, entered into a "Service Agreement" with Maxwell- Walker, dated April 19, 2012, to provide these types of services in exchange for a flat

rate payment to Maxwell- Walker of $10,000 per month, plus reimbursement of mileage. That Contract, by its express terms, terminated on July 14, 2012; however Pohl continued to make those payments for similar services for some time after the expiration of the Contract.

89. Later, Pohl, on behalf of all Defendants, asked Maxwell- Walker to process and pay contracted rates (agreed to and/or approved by Pohl, on behalf of all Defendants) to public relations and/or investigator contractors, and related support staff, in Mississippi, and elsewhere. Maxwell Walker would collect receipts and compensation information and advance payments therefore; and Pohl would make weekly and/or periodic wires of funds into the accounts of Maxwell- Walker to cover compensation and expense reimbursement payments made to said contractors / support staff by Maxwell- Walker. As compensation for these services, and pursuant to Pohl's agreement, Maxwell- Walker collected a 3% Administrative Fee (negotiated down from its normal fee by Pohl) on all pass through amounts. Pohl also paid, on behalf of the Defendants, the salaries / hourly compensation of certain administrative employees and certain office expenses.

90. Pohl directed Plaintiffs to start Precision Marketing, and Pohl paid for a Lease on the 12th Floor of Hancock Bank in Gulfport, Mississippi to house its operations. That location became the center of operations for performing all obligations pursuant to the contract and agreements by and between the Pohl / Williamson Partnership and the Plaintiffs. Precision Marketing, and Pohl's "satellite Mississippi law office" operated out of Hancock Bank from December, 2012 through March, 2014; at which time the offices (Precision Marketing and Pohl's Mississippi "law office") were relocated to Cedar Lake Road in Biloxi, Mississippi.

91. Pohl, on behalf of all Defendants, asked Precision Marketing to, in addition to serving as the center of operations for services related to the subject Contracts, process and pay contracted rates (agreed to and/or approved by Pohl, on behalf of all Defendants) to other public relations

and/or investigator contractors and support staff in Mississippi, and elsewhere.   Precision Marketing would collect receipts and compensation information and make payments; and Pohl would make weekly and/or periodic wires of funds into the accounts of Maxwell Walker to cover compensation and expense reimbursement payments made to said contractors / support staff by Precision Marketing.   As compensation for these services, and pursuant to Pohl's agreement, Precision Marketing collected $1,000 per week.   Pohl also paid, on behalf of the Defendants, the salaries / hourly compensation of certain administrative employees and certain office expenses.

92. Precision Marketing also performed other public relations and administrative services for Pohl, unrelated to BP oil spill claims, including those related to Pohl's and his joint venturers' representation of roll over and similar catastrophic injury cases in various places.

93. Between April, 2012 and January, 2014, approximately four million ($4,000,000) was "passed through" Maxwell Walker and/or Precision Marketing by Pohl, in this fashion. The payments referenced in this section do not represent payments of compensation due to Plaintiffs under the May 25, 2012 Contracts and/or July 15, 2012 Contract; nor are they subject to any credit or offset against the unpaid compensation and expenses promised and owed to Plaintiffs described in other sections of this Complaint.

94. By email dated October 10, 2014, after Plaintiff's First Complaint was filed, Pohl advised Plaintiffs that "I no longer need the services of a Mississippi office. …. If you would like to buy my office furniture, please make me an offer."

### Additional Evidence of Partnership / Joint Venture / Co-Principals

95. At all material times, Jimmy Williamson, Jimmy Williamson, P.C. and Michael Pohl, individually and d/b/a The Law Office of Michael Pohl formed and were acting as a Partnership

and/or Joint Venture for the purposes of conducting the business of representing clients – primarily Mississippi businesses and/or Mississippi residents – and resolving their claims (for profit) arising from the Deepwater Horizon Oil Spill.

96. At the direction and under the direct supervision and control of Michael Pohl and Jimmy Williamson, Plaintiffs' marketing and public relations efforts included, in addition to distributing the leather bound notebooks discussed above, providing individuals and entities seeking representation in relation to the BP oil spill with a letter from Michael Pohl extolling the virtues of Pohl's self described "partner" in the BP oil spill related claims settlement process and/or litigation, Jimmy Williamson, whom Pohl described as having taken over 50 of the 300 depositions taken in Phase I of the BP litigation, and as being selected as one of 10 lawyers who would actually try the cases against BP.  The letter went on to state that Pohl and Williamson had "assembled a team of accountants and workers to process and evaluate claims …."  (See letter dated August 23, 2012 attached as "Exhibit 9").

97. In an email to a prospective joint venture attorney dated January 2, 2013, copied to Williamson and the Plaintiffs, Pohl stated "Jimmy [Williamson] and I work as partners on BP spill claims."  (See email attached as "Exhibit 10")

98. On or about May 28, 2013, Pohl drafted an "Affirmation" that he tried to get the Plaintiffs to sign; stating that Plaintiffs were "well satisfied and pleased with the professional services and conduct of the Law Office of Michael A. Pohl and Jimmy Williamson, PC."  The Affirmation prepared by Pohl included statements that Plaintiffs "have performed Public Relations services with respect to the BP Deepwater Horizon Oil Spill for the Law Office of Michael Pohl and Jimmy Williamson, PC".  In an email dated June 22, 2013, Pohl asked Plaintiffs to bring the signed affirmation when they came to Jimmy's [Williamson's] office.

(See string of emails, and draft Affirmation attached as "Exhibit 11").   The requested Affirmation was never fully executed.

99. In January, 2013, Pohl, on information and belief on behalf of all Defendants, expressly confirmed that the May 25, 2012 Contracts and July 15, 2012 Contract were in reality contracts between Plaintiffs and Jimmy Williamson, P.C..  While sitting at the conference room table at the Precision Marketing / Pohl Satellite Mississippi law office in Gulfport, Mississippi, on January 4, 2013, Pohl presented all three Plaintiffs with two documents, titled "Public Relations Amendment".  The Amendments stated, respectively, in part, that the May 15, 2012 Contracts and the July 15, 2012 Contract "between the Law Office of Michael A. Pohl and the below signed parties are hereby continued in full force and effect with Pohl & Berk, LLP [Nashville, Tennessee] **instead of Jimmy Williamson, P.C**.." (See documents attached as "Cumulative Exhibit 12") (emphasis added).  Although the documents bear the typed date of January 1, 2013, they were not signed by any party until January 4, 2013.  Although the document referring to the July 15, 2012 Contract also makes reference to an alleged "June 1" "Public Relations Consulting Agreement", no such document was ever entered into by and between the Defendants, or any of them, and the July 15, 2012 Group.

100.   Pohl first explained that signing these documents was necessary because Williamson had allegedly become "too busy with BP and Transocean", and needed "a break".  Pohl explained that, while they had "lost superman [Williamson]", Pohl's Nashville partner, Berk, was going to take his place.  However, within about two weeks Pohl reported Berk was not interested in being involved; and that after a long conversation between Pohl and Williamson, Williamson had agreed to continue his involvement and represent clients obtained and/or serviced through the public relations efforts of the Plaintiffs.  Upon information and belief, the January, 2013 "Amendments" did not materially change the nature of the Partnership between

34

Williamson and Pohl; but were simply documents formulated by Defendants in an effort to distance and/or attempt to disassociate Williamson from responsibility for fulfilling the obligations owed to the Plaintiffs.

101. Williamson also acknowledged the Partnership with Pohl, as demonstrated in the Cover Letter contained within "Exhibit 3", by Williamson's repeated referrals to Williamson and Pohl jointly as "we", and reference to "our contract" when directing potential clients to a contingency fee contract by which they could choose to represented by Williamson and Pohl (referred to jointly as "attorney" in the Contract) on their BP claims.

102. On information and belief, Jimmy Williamson, Jimmy Williamson, P.C. and Michael Pohl, individually and d/b/a The Law Office of Michael Pohl, shared profits obtained from resolving, and/or expect to share profits obtained from resolving the as yet unresolved (if any), oil spill claims of the approximately 10,613 individuals and entities who chose to be represented by Defendants on their BP oil spill claims as a direct and proximate result of the public relations and marketing efforts of the Plaintiffs under May 25, 2012 and July 15, 2012 Contracts and/or in reliance upon the promises of the Defendants.

103. On information and belief, the $209,750.00 of hourly fees that has been paid to Plaintiffs under the subject Contracts, and some amount of out of pocket expenses that were paid by Pohl, were made subject to the "the British Petroleum representation agreement between Jimmy Williamson, P.C. and the Law Office of Michael Pohl."

104. Pohl's execution of the May 25, 2012 and July 15, 2012 Contracts, and any and all additional conduct of Pohl and Williamson / Jimmy Williamson, P.C. related to those Contracts and/or the business of representing clients and resolving claims related to the Deepwater Horizon oil spill, were in furtherance of the business for which the Partnership and/or Joint Venture between Jimmy Williamson, Jimmy Williamson, P.C., Michael Pohl, individually and d/b/a The

Michael Pohl Law Firm, and as yet unidentified John and Jane Doe Defendants were formed, and/or were made pursuant to the express and/or implied authorization of that Partnership and/or Joint Venture and/or Jimmy Williamson.  Additionally, and in the alternative, at all material times the Plaintiffs, and each of them, reasonably believed that each act of Pohl and Williamson related to the business of representing clients and resolving claims related to the Deepwater Horizon oil spill was authorized by the Partnership, Joint Venture, and/or Pohl and Williamson.

105.  Although he chose to be a semi-silent partner, Jimmy Williamson / Jimmy Williamson, P.C., on information and belief, directed, controlled and/or directly participated in the conduct of Michael Pohl, individually and d/b/a The Law Office of Michael Pohl, related to the subject Contracts and the business of representing clients and resolving claims related to the Deepwater Horizon oil spill.  Jimmy Williamson also personally directed and controlled many of the actions of the Plaintiffs with regard to their public relations and marketing efforts related to Defendants' representation of individuals and entities wishing to pursue BP oil spill claims; and promises of compensation to the Plaintiffs.

106.  During a Chartered Plane flight from Gulfport, Mississippi to Easton, Maryland (the cost of which was paid and/or reimbursed by Williamson) to market Pohl's and Williamson's services to crab houses in Maryland on or about May 29, 2012, Jimmy Williamson told Scott Walker, Steve Seymour and Kirk Ladner "if the three of you continue signing me clients like this, you will each be very rich, very soon."  By email correspondence (forwarded to Plaintiffs) dated November 19, 2012, Jimmy Williamson made it very clear that persons contracted to provide public relations / marketing services such as those provided by the Plaintiffs who did not demonstrate a sense of urgency in fulfilling those services would be "off the team and forgotten".  By subsequent email correspondence to Pohl and these Plaintiffs dated January 22, 2013, Williamson identified specific individuals and entities involved in the seafood business who

were seeking representation on claims related to the BP oil spill, and urged these Plaintiffs to up their efforts lest Williamson "lose the right to pursue" those claims.  By email correspondence dated December 26, 2012, Williamson provided Pohl and these Plaintiffs spreadsheets identifying 195 entities and individuals, and urged that information necessary to make presentment in the BP settlement administrative claims procedure must be collected from those identified as soon as possible in light of an upcoming January 18th deadline for presentment.

### Other Contracts / Non Waiver

107.     Plaintiffs have other contracts for marketing / public relations services in place with Pohl (on information and belief in partnership or joint venture with others as described below) which are not made the subject of this Complaint.  Those contracts include, but are not limited to:

a.   An April 19, 2012 "Services Agreement" and May 9, 2012 "Operating Agreement" between Maxwell & Walker Consulting Group, LLC / Scott Walker / Robert Maxwell and Michael Pohl (joint venturing and co principal with Jimmy Williamson and Jimmy Williamson, P.C.) related to public relations / marketing / investigative services with regard to BP oil spill claims;

b.   A July 1, 2014 "Operating Agreement" between GM Settlement Verification Team, LLC / Kirk Ladner / Scott Walker and Michael Pohl related to public relations / marketing / investigative services with regard to every case in which the "GM Settlement Verification Team" / Scott Walker / Kirk Ladner is retained in GM related rollover / products liability cases.

c.   An April 24, 2013 "Operating Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl related to public relations / marketing / investigative services with regard to vehicle accidents and/or death;

d.  A June 20, 2014 "Retention of Services Agreement" between Claim Verification Team / The Helping Hands Group, LLC / Kirk Ladner / Scott Walker and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to a specific catastrophic accident;

e.  A June 20, 2014 "Retention of Services Agreement" between Claim Verification Team / The Helping Hands Group, LLC / Kirk Ladner / Scott Walker and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

f.  A May 3, 2014 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic event;

g.  A February 20, 2014 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

h.  A January 7, 2014 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public

38

relations / marketing / investigative services with regard to another specific catastrophic accident;

i.   An October 28, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

j.   An October 28, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

k.   A July 30, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

l.   A July 12, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

m. A July 8, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing

and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

n.  A July 8, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

o.  An April 30, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

p.  An April 29, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident;

q.  An April 29, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident; and

r.   An April 24, 2013 "Retention of Services Agreement" between Precision Marketing Group, LLC / Kirk Ladner / Scott Walker / Steve Seymour and Michael Pohl (joint venturing and co principal with Rob Ammons / The Ammons Law Firm, LLP) related to public relations / marketing / investigative services with regard to another specific catastrophic accident.

108.   Consistent with the ordinary practice between these parties, many of these Contracts expressly state that services by the Group will be compensated at the rate of $1,500 per hour.

109.   Although they are not made the subject of this Complaint, Plaintiffs affirmatively reserve any and all rights and/or causes of action they may have with respect to each of the contracts identified above.

**CHOICE OF LAW**

110.   By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

111.   Plaintiffs' Complaint contains allegations that sound in tort, and those that sound in Contract.

112.   Defendants committed each of the torts described herein, including but not limited to the independent tort of bad faith, in the State of Mississippi.  The foreseeable injuries and damages caused by Defendants have been suffered in Mississippi, and no State has a more substantial interest in applying its law to the resolution of those injuries and damages than Mississippi.  In addition to being the State where the subject injuries occurred, Mississippi is where the place where the conduct of the Defendants that caused those injuries occurred, is the residence of all three Plaintiffs, is the domicile and principle place of business of Precision Marketing, and served as the center of operations for the business of Defendants' Partnership /

Joint Venture.  The relationship by and between the Defendants and the Plaintiffs is centered in Mississippi.

113.  Additionally, and in the alternative, neither the May 25, 2012 Contracts nor the July 15, 2012 Contract specify the State law under which their terms shall be interpreted nor claims thereunder adjudicated.  Each of those contracts was negotiated in the State of Mississippi, drafted by Pohl in the State of Mississippi; and signed by Pohl (on behalf of all Defendants) and the Plaintiffs in the State of Mississippi.  Both the May 25, 2012 and July 15, 2012 Contracts were entered into on behalf of a Partnership whose expressed purpose was to obtain and represent Mississippi businesses and residents on BP oil spill claims.

114.  The primary purpose of the Partnership of Pohl and Williamson, which entered into the subject contracts with the Plaintiffs, as expressed to Plaintiffs, was to represent Mississippi businesses in their BP oil spill claims.

115.  The place of performance and the subject matter of the subject Contracts is located in Mississippi.  Each of the subject Contracts involved promises to pay Mississippi residents for services to be rendered in Mississippi and elsewhere – but primarily in the State of Mississippi. Defendants utilized office space in Mississippi (first Gulfport then Mississippi) paid for by Pohl, and furnished by Pohl, which space was referred to by Pohl as his "Mississippi", "Gulfport" and/or "satellite" "law office", as the center of operations for the business of their Partnership / Joint Ventures and the subject Contracts. Defendants delivered brochures, letters and other documents to Plaintiffs, in Mississippi, to be delivered to Mississippi residents or Mississippi businesses in Mississippi; for the purpose of inducing Mississippi businesses and/or residents to hire Pohl / Williamson to handle their BP oil spill claims.  Defendants, and each of them, repeatedly traveled to Mississippi to meet with representatives of Mississippi entities and/or businesses to fulfill the business of the subject Partnership.  As a direct and proximate result of

the services performed by the Plaintiffs that form the basis of this Complaint, Defendants represented and/or represent thousands of Mississippi businesses, entities, cities, municipalities and/or County's in their BP oil spill claims. As a direct and proximate result of the services performed by the Plaintiffs that form the basis of this Complaint, Defendants associated numerous Mississippi law firms and Mississippi lawyers to jointly represent hundreds of Mississippi businesses and residents with BP Oil Spill claims. The limited payments made to Plaintiffs by the Defendants have been delivered to Plaintiffs in the State of Mississippi. Invoices for those services were prepared in Mississippi.

116. Each of the Plaintiffs is a resident of Mississippi, and Mississippi has the greatest interest in fashioning the remedies recoverable by its residents as a result of the actions of out of state individuals and entities who voluntarily came to Mississippi; and who in Mississippi induced Plaintiffs to materially change their positions to their detriment and to perform months' worth of work and services in reliance of promises of compensation made by the Defendants in Mississippi. Although Pohl and Williamson are Texas Residents, they chose to leave Texas to set up shop in Mississippi, and centered the business and operations that are the subject matter of this Complaint in Mississippi.

117. Additionally, and in the alternative, the promises made to Plaintiffs by Defendants upon which Plaintiffs relied to substantially change their positions in order to provide the services requested by Defendants in expectation of being compensated as set forth herein above, were made to Plaintiffs by Defendants in Mississippi.

118. Had Defendants, who are both lawyers (one of which who drafted the subject contracts), wished to have any disputes which may arise under those contracts resolved pursuant to Texas law, they could and should have incorporated such provisions into the terms of the contracts. They did not do so. As lawyers, Defendants know, or should have known, that

drafting contracts in the State of Mississippi, and signing contracts in the State of Mississippi for services to be provided primarily in the State of Mississippi, would lead those contracts to be interpreted in accordance with Mississippi law in the absence of terms to the contrary.

119.  Considering a maximization of relevant contacts, and the applicable sections of the Restatement dealing with actions sounding in tort and those sounding in contract, Mississippi has the most significant relationship to the underlying events and parties and/or the greatest concern with the specific issues (compensation for injuries suffered in Mississippi caused by torts committed in Mississippi; and enforcing the contractual rights of Mississippi Residents and a Mississippi limited liability company under written contracts negotiated and executed in Mississippi and/or oral contracts made in Mississippi) with respect to the liabilities and rights of the parties to this action.  As such, to the extent that it can be shown that there is a material difference in Mississippi law and the law of some other State whose law Defendants may seek to invoke, Mississippi law applies to all substantive issues of law raised by this Complaint and/or any and all defenses thereto.

### COUNT I:  JOINT VENTURE / PARTNERSHIP / CO-PRINCIPALS

120.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

121.  As described in the factual assertions above, Jimmy Williamson, Jimmy Williamson, P.C., Michael Pohl, individually and d/b/a The Law Office of Michael Pohl, and as yet unidentified John and Jane Doe Defendants formed, and at all material times were acting as, a Partnership, Joint Venture, and/or as Co-Principals with regard to the business of representing clients and resolving claims (for profit) arising from the Deepwater Horizon oil spill.  The primary expressed purpose of that Partnership was to represent Mississippi businesses or residents in BP oil spill claims.

122. As set forth with particularity above, Defendants each: expressed their intent to be partners; had the right to participate and did participate in the business of the partnership; had an agreement to contribute and did contribute money or property to the business of the partnership; had the right to share and have shared in the profits of the business of the partnership; and agreed to share in any losses or liabilities of the business of the partnership.

123. On information and belief, Defendants did not formally file their partnership with the Secretary of State of any State.

124. Pursuant to common law and statutory law, each of the members of the described Partnership and/or Joint Venture is an agent of the Partnership and/or Joint Venture for the purpose of conducting its business; and the act of any partner, including but not limited to Pohl's acts of signing the subject contracts and accepting and issuing partial payments for invoices tendered in relation thereto, and Pohl's and Williamson's promises of compensation in return for the services rendered by the Plaintiffs, binds the Partnership / Joint Venture and each member thereof.

125. Also pursuant to statutory and common law, Pohl, Williamson, Jimmy Williamson, P.C. and as yet unidentified John and Jane Doe Defendants are each individually, and jointly and severally, liable for any and all injuries and damages of the Plaintiffs described in this Complaint.

126. Additionally, and in the alternative, as set forth with particularity above, Jimmy Williamson and Jimmy Williamson, P.C exercised sufficient dominion and/or control over Michael Pohl and/or participated directly with Pohl such that Pohl was said Defendants' agent and/or was a co-principal with said Defendants, such that Defendants, and each of them, are individually and jointly and severally liable for any and all damages and injuries of the Plaintiffs described herein.

## COUNT II:  BREACH OF CONTRACT, and THE INDEPENDENT TORTS OF BAD FAITH, AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

127.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

128.  As described with particularity above, Plaintiffs fulfilled all their duties and obligations under the May 25, 2012 and July 15, 2012 Contracts.  Pohl, and the Partnership / Joint Venture with Williamson / Williamson P.C. whose interests he represented and the members of same, and each of them, had a duty to compensate the Plaintiffs at the hourly rate of $1,500 an hour, 10 hours a day, 7 days a week, for the time period May 25, 2012 through the present; and to reimburse the Plaintiffs' incurred expenses for services rendered for the Defendants.

129.  As described with particularity above, Defendants, and each of them, breached their duties under the subject Contracts, and each of them, unreasonably delayed payment of fees and expenses due thereunder, and simply refused to pay the majority of fees and expenses due thereunder without any legitimate or arguable reason.

130.  Defendants had a duty to respect and honor Plaintiffs' rights under the subject contracts and not recklessly disregard those rights, and at all material times to treat Plaintiffs with good faith and fair dealing, implied by law.

131.  As described with particularity above, Defendants, and each of them, breached those duties.

132.  As described with particularity above, Defendants, and each of them, engaged in conduct that rises to the level of an independent tort, and acted with gross and/or reckless disregard for the rights of the Plaintiffs, and each of them, to the financial advantage of Defendants and financial determinant of the Plaintiffs.

133. Defendants, and each of them, are liable for the acts and/or omissions described throughout this Complaint, which include but are not limited to:

a.   Negligent, grossly negligent and/or reckless failure to pay Plaintiffs hourly fees and expenses due under the May 25, 2012 Contracts in a timely fashion, and unreasonably delaying payment of said fees and expenses;

b.   Negligent, grossly negligent and/or reckless failure to pay Plaintiffs hourly fees and expenses due under the July 15, 2012 Contract in a timely fashion, and unreasonably delaying payment of said fees and expenses;

c.   Negligent, grossly negligent and/or reckless refusal to pay Plaintiffs the majority of hourly fees and expenses due under the May 25, 2012 Contracts;

d.   Negligent, grossly negligent and/or reckless refusal to pay Plaintiffs the majority of hourly fees and expenses due under the July 15, 2012 Contract;

e.   Acting in conscious, gross and/or reckless disregard for the rights of the Plaintiffs, and each of them, as described with particularity throughout this Complaint; and

f.   Acting wrongfully in other respects to be shown upon a trial of this cause.

134.   The actions of Defendants, and each of them, constitute breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, reckless disregard, negligence and/or gross negligence, rendering said Defendants liable to the Plaintiffs, and each of them, for actual, compensatory and punitive damages.

135.   As a direct, proximate and foreseeable consequence of Defendants', and each of their, breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, reckless disregard, negligence and/or gross negligence, Plaintiffs were injured and damaged as described throughout this Complaint, for all of which Plaintiffs, and each of them, are entitled to be compensated by the Defendants, jointly and severally.  In addition to actual damages due in the amount of hourly fees and expenses due under the terms of the subject contracts, described above, it was foreseeable to Defendants, and each of them, that Plaintiffs and each of them

47

would suffer and/or incur, and Plaintiffs and each of them did suffer and incur, emotional distress and anxiety as a direct and proximate result of Defendants' misconduct and failure to honor their contractual obligations and/or promises to the Plaintiffs, and attorneys' fees and expenses for having to file suit to enforce their contractual rights.   Under applicable law, Plaintiffs are entitled to be compensated by the Defendants for all of these damages, and other incidental damages incurred as a result of having to pursue this litigation.

136.    Defendants', and each of their, bad faith conduct described in the preceding paragraphs rises to the level of an independent tort, and/or represents reckless disregard for the rights of the Plaintiffs, and each of them; such that Plaintiffs, and each of them, are entitled to recover punitive damages from the Defendants, and each of them, in an amount sufficient to punish the Defendants and serve as an example to deter these Defendants and similarly situated individuals and entities from engaging in such conduct in the future; and to reward Plaintiffs for bringing Defendants' misconduct to light.

### COUNT III:  QUANTUM MERUIT / UNJUST ENRICHMENT

137. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

138. Additionally, and in the alternative, to the extent the Court rules that one or all of the subject contracts are not legally enforceable, and/or that some of the services performed by Plaintiffs that are described in this Complaint are not covered by one of the subject Contracts, Plaintiffs are entitled to recover compensation and expenses from the Defendants, and each of them, pursuant to the theories of Quantum Meruit and/or Unjust Enrichment.

139. As alleged with particularly above, at all material times Plaintiffs provided valuable services to Defendants, and each of them, in connection with Defendants' Joint Venture /

Partnership business of representing and resolving the claims of individuals and entities harmed and/or allegedly harmed by the Deepwater Horizon oil spill, primarily in Mississippi.

140. Defendants readily accepted the services rendered by the Plaintiffs, and repeatedly urged Plaintiffs to continue those services in return for earning substantial compensation – more than ten millions dollars.  As a direct and proximate result of Plaintiffs' efforts, Defendants represented approximately 10,613 individuals and entities harmed and/or allegedly harmed by the Deepwater Horizon oil spill.  On numerous occasions, Pohl told Plaintiffs that Defendants expected to jointly earn more than ONE HUNDRED MILLION DOLLARS in legal fees as a direct and proximate result of the services performed by the Plaintiffs, and that Plaintiffs should expect to be paid more than TEN MILLION DOLLARS in exchange for the services they were going to provide, and did provide, to the Defendants.

141. On information and belief, Defendants and each of them have reaped substantial profits from representing said individuals and entities in administrative claims arising from the BP oil spill; and/or will reap substantial profits in the future in administrative claims and/or possible legal representation.  By way of limited example, on or about January 15, 2013 Defendants determined that a "midpoint estimate" of the value of one single claim for a municipality who signed a BP oil spill related contract with the Defendants as a direct and proximate result of the marketing and public relations services of the Plaintiffs was "$24.84 million in 2012 dollars".

142. Plaintiffs do not know as of the time of filing this Complaint whether Defendants reaped additional profits by allocating fees and/or expenses due or owing to the Plaintiffs by arbitrarily and/or fraudulently allocating portions of said fees and/or expenses to "expenses" incurred with regard to representation of individual oil spill clients and/or in lodestar expenses submitted in connection with Common Benefit costs in the pending multi district litigation, and

by thus "recovering" said fees and/or expenses from individual oil spill clients and/or BP. Discovery in this case is expected to answer those questions.

143. At all relevant times, when Defendants accepted, used and enjoyed the fruits of Plaintiffs' services; and Pohl, and the Partnership / Joint Venture with Williamson / Williamson P.C. whose interests he represented and the individual members of same, knew or reasonably should have known that Plaintiffs expected to be paid collective hourly fees of $1,500 an hour, to be calculated upon the basis of 10 hours a day, 7 days a week, plus reimbursement of incurred expenses, for providing those services that were accepted, used and enjoyed by the Defendants.

144. The profits Defendants earned and/or are expected to earn in the future are due, in large part, to the efforts of the Plaintiffs. Defendants expected Plaintiffs to perform the services they did provide so Defendants could obtain large profits; and Pohl, and the Partnership / Joint Venture with Williamson / Williamson P.C. whose interests he represented and the individual members of same, expected Plaintiffs to rely on Pohl's promises to pay Plaintiffs fees of $1,500 an hour, 10 hours a day, 7 days a week, plus reimbursement of incurred expenses, for providing those services.

145. Defendants have not paid the Plaintiffs the fees and expenses promised in return for the services that were provided, in good faith, by the Plaintiffs. Defendants, and each of them, were thus unjustly enriched due to the efforts and services of the Plaintiffs. Justice, good conscience, sound public policy, and/or applicable law require that Defendants not be thus unjustly enriched, and that Defendants be required to disgorge their ill gotten profits earned at Plaintiff's expense and turn them over to the Plaintiffs to whom in good conscious they belong.

146. In addition to actual damages due in the amount of Defendants ill gotten profits, described above, it was foreseeable to Defendants, and each of them, that Plaintiffs and each of them would suffer, and Plaintiffs and each of them did suffer, emotional distress and anxiety as a

direct and proximate result of Defendants' misconduct and failure to honor their promises to the Plaintiffs. Under applicable law, Plaintiffs are entitled to be compensated by the Defendants for all of these damages, and other incidental damages incurred as a result of having to pursue this litigation to enforce their rights, including but not limited to attorneys' fees and costs of this action.

147.   Pursuant to the doctrines of Quantum Meruit and/or Unjust Enrichment, Plaintiffs, and each of them, are entitled to be compensated by the Defendants, jointly and severally, for all of the damages set forth throughout this Complaint.

**COUNT IV:  FRAUD / FRAUDULENT INDUCEMENT /
FRAUDULENT MISREPRESENTATION**

148.   By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

149.   As specifically alleged above, Pohl, on behalf of all Defendants, and separately Williamson, on behalf of all Defendants, made inducements and representations to the Plaintiffs, including the promised consideration for public relations services in relation to the business of representing clients in BP oil spill claims, which representations were false and material, and which were known by the Defendants to be false.

150.   On May 22, 2012, Pohl, on behalf of all Defendants, told Walker and Seymour at the Hampton Inn on the beach in Biloxi, Mississippi that the partnership of Pohl and Williamson wanted to retain their public relations services to help Defendants obtain representation of businesses, cities, municipalities, counties and individuals looking for representation on BP oil spill claims. Pohl told Walker and Seymour that, in return for those services, they would make millions of dollars.

151.   On or about July 31, 2012, at the airport in Gulfport, Mississippi, Pohl, on behalf of all Defendants, told Walker and Seymour that the partnership of Pohl and Williamson wanted to

retain their public relations services, as well Ladner's, to help Defendants obtain representation of businesses, cities, municipalities, counties and individuals looking for representation on BP oil spill claims. Pohl told Walker and Seymour that, in return for those services, Walker and Seymour and Ladner would make millions of dollars.

152. In numerous telephone and personal conversations, Pohl, on behalf of all Defendants, told Walker and Ladner and Seymour that they should expect to make more than TEN MILLION DOLLARS performing the services requested by the Defendants. One such representation occurred on Monday, January 28, 2013. On that date, while dining at Bacchus Restaurant in Gulfport, Mississippi, Pohl, on behalf of all Defendants, told Walker and Ladner that "Jimmy [Williamson's] Goal is ONE HUNDRED MILLION DOLLARS in legal fees [from representation of BP claimants obtained and/or serviced in connection with the public relations services provided by the Plaintiffs]"; and that Plaintiffs should expect to earn "over TEN MILLION DOLLARS" from performing the services requested by and contracted for by the Defendants.

153. During a Chartered Plane flight from Gulfport, Mississippi to Easton, Maryland on May 29, 2012, Jimmy Williamson, on behalf of all Defendants, told Scott Walker, Steve Seymour and Kirk Ladner "if the three of you continue signing me clients like this, you will each be very rich, very soon."

154. In August, 2012, during dinner at Ruth's Chris in Tampa, Florida, Williamson told Ladner and Walker that they were going to "make a fortune" if they kept performing services for the Defendants.

155. On October 2, 2013, while standing next to his hired car and driver in the parking lot of Habitat for Humanity in Gulfport, Mississippi, at approximately 12:00 p.m., Williamson, on behalf of all Defendants, told Ladner, Walker and Seymour that they were performing "good

work", and that their continuing efforts were going to "add to the millions of dollars [Plaintiffs] are going to make."

156. Pohl, on behalf of all Defendants, repeatedly told Walker and Seymour (between May, 22, 2012 and October, 2014), and repeatedly told Ladner (between approximately July 15, 2012 and October, 2014), that each of them were going to be paid the millions of dollars promised by Defendants in return for the services they provided pursuant the subject contracts.

157. At the time each of the above referenced representations were made, Pohl and Williamson, respectively, knew or should have known that they were false, because Defendants, and each of them, never intended to pay Plaintiffs millions of dollars and/or to make them very rich.

158. Rather, Defendants intended to themselves get very rich off the sweat of Plaintiffs' efforts.   At the time each of the above referenced representations were made, Pohl and Williamson, respectively, intended to induce the Plaintiffs, and each of them, to rely on their representations and, in reliance thereon, to abandon other employment opportunities and to devote huge quantities of their time to marketing the Joint Venture's / Partnership's services to individuals and entities who expressed an interest in being represented on BP oil spill claims and/or in associating Williamson / Pohl on such claims; and to servicing and maintaining those clients' relationships with and loyalty to the Joint Venture / Partnership of Williamson and Pohl once represented by Defendants, in the manner reasonably contemplated by Defendants.

159. At the time each of the above referenced, respective representations were made, Plaintiffs, and each of them, were unaware of their falsity, but substantially changed their positions and provided the services requested by Defendants in the manner reasonably contemplated by Defendants, and each of them, in reliance on Defendants' representations of millions of dollars in compensation as being truthful.   In reasonable reliance on each of the

above referenced representations, each of which Plaintiffs understood was being made on behalf of the Partnership between Williamson and Pohl, Plaintiffs, and each of them, performed the services requested by the Defendants – and continued to perform those services despite Defendants' repeated deference of payment to the Plaintiffs of the millions of dollars owed and promised to the Plaintiffs, and each of them, by the Defendants.

160.  As specifically alleged above, at all material times Plaintiffs, and each of them, were justified in expecting honesty, good faith and fair dealing from the Defendants, and each of them; and had a right to rely on Pohl's, acting on behalf of the Joint Venture / Partnership of Jimmy Williamson, Jimmy Williamson, P.C. and each of the individual members thereof, and on Williamson's (also acting on behalf of the Partnership), representations.

161.  As specifically alleged above and below, Plaintiffs, and each of them, were damaged, and said damages were proximately caused by, Pohl's and Williamson's, on information and belief acting on behalf of their Joint Venture / Partnership and each of the individual members thereof, conduct and Plaintiffs' reasonable reliance on Defendants', and each of their, representations.

162.  As a result of Defendants', and each of their, fraudulent conduct, Plaintiffs, and each of them, are entitled to all actual, compensatory, extra contractual, punitive and consequential damages set forth throughout this Complaint.

## COUNT V:  AIDING AND ABETTING FRAUD / FRAUDULENT INDUCEMENT / UNJUST ENRICHMENT

163.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

164.  John and Jane Doe Defendants A, B, C, D, E, F, and G may include individuals and/or entities who conspired with Defendants in conducting the affairs and conduct described above of the Deepwater Horizon oil spill claims business in which the Defendants formed the

aforementioned Partnership and/or Joint Venture; and/or on whose behalf the above referenced fraudulent representations were also made.

165.  To the extent said John and Jane Doe Defendants aided and/or abetted in the wrongful and fraudulent acts of the Defendants, and/or shared in the unjust enrichment of the Defendants described above, said Jane and John Doe Defendants, on information and belief, proximately caused or contributed to the injuries and damages of the Plaintiffs, and each of them, described throughout this Complaint.  Said damages were, or should have been, foreseeable to said Jane and John Doe Defendants for aiding and/or abetting the wrongful and fraudulent acts of the Defendants.

166. Said John and Jane Doe Defendants, and each of their, conduct described in the preceding paragraphs rises to the level of an independent tort, and/or represents reckless disregard for the rights of the Plaintiffs, and each of them, such that Plaintiffs, and each of them, are entitled to recover punitive damages from said John and Jane Doe Defendants, and each of them, in an amount sufficient to punish said Defendants and serve as an example to deter said Defendants and similarly situated individuals and entities from engaging in such conduct in the future; and to reward Plaintiffs for bringing said Defendants' misconduct to light.

## COUNT VI:  WAIVER AND EQUITABLE ESTOPPLE

167.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

168.  As alleged with particularity above, Plaintiffs at all material times believed and relied upon Pohl's, on behalf of all Defendants, multiple representations and promises that hourly fees of $1,500 per hour, calculated at 10 hours per day, 7 days per week, plus reimbursement of expenses would be paid by the Defendants, and that it was not necessary for Plaintiffs to keep or provide detailed daily and/or hourly time records, and in such reliance performed all things

necessary and reasonable for significant profits to be earned by Defendants and their Partners / Joint Venturers in representing and/or resolving the claims of BP oil spill clients.

169.   As alleged with particularity above, Defendants' promises caused Plaintiffs, and each of them, to materially and substantially change their positions in reliance thereon.

170.   As described with particularity above, Plaintiffs' belief in and reliance upon the multiple representations and promises of the Defendants, and each of them, ultimately resulted in substantial damages to the Plaintiffs, and each of them, and significant profits to the Defendants, and each of them.

171.   As a result, Defendants', and each of their, acts and omissions are so egregious as to justify the application of the doctrines of equitable estoppel and waiver.   Defendants have effectively waived, and/or should be estopped from asserting, defenses they may otherwise have asserted to the claims of the Plaintiffs herein.

## DAMAGES

172.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

173.   As a direct and proximate result of the conduct, actions, inactions, and behavior of the Defendants, and each of them, as more fully set forth in the preceding paragraphs, Plaintiffs, and each of them, have suffered, and are entitled to receive from the Defendants, injuries and damages caused by the Defendants' misconduct.   The injuries and damages suffered by the Plaintiffs, for which Defendants, jointly and severally, should be required to compensate the Plaintiffs, include, but are not limited to:

a.   Hourly fees due and owing, and incurred, pursuant to the May 25, 2012 Contracts and/or the promises made by Defendants and the detrimental reliance of the Plaintiffs made in relation thereto in the liquidated amount of $576,200.

b.  Pre-judgment and post-judgment interest in the amount of 8% per year, and/or such other amount deemed appropriate by the Court, on the liquidated hourly fees due and owing under the May 25, 2012 Contracts in the amount of $576,200, to run from July 15, 2012 until paid in full;

c.  Hourly fees due and owing, and incurred, pursuant to the July 15, 2012 Contract and/or the promises made by Defendants and the detrimental reliance of the Plaintiffs made in relation thereto in the liquidated amount of $7,875,000.

d.  Pre-judgment and post-judgment interest in the amount of 8% per year, and/or such other amount deemed appropriate by the Court, on the liquidated hourly fees due and owing under the July 15, 2012 Contract in the amount of $7,875,000, to run from January 21, 2014 until paid in full;

e.  Expenses of the Plaintiffs due and owing, and incurred, pursuant to the May 25, 2012 Contracts and/or the promises made by Defendants and the detrimental reliance of the Plaintiffs made in relation thereto in an amount to be determined by a Jury, plus pre-and post judgment interest thereon from the date incurred through the date paid in full;

f.  Expenses of the Plaintiffs due and owing, and incurred, pursuant to the July 15, 2012 Contract and/or the promises made by Defendants and the detrimental reliance of the Plaintiffs made in relation thereto in an amount to be determined by a Jury, plus pre-and post judgment interest thereon from the date incurred through the date paid in full;

g.  Compensation for emotional distress suffered by the Plaintiff, Scott Walker, as direct and proximate result of Defendants' misconduct and breach of the May 25 and July 15, 2012 Contracts, in an amount to be determined by a Jury and pre- and post-judgment interest thereon in the amount of 8% per anum;;

h.  Compensation for emotional distress suffered by the Plaintiff, Steve Seymour, as direct and proximate result of Defendants' misconduct and breach of the May 25 and July 15, 2012 Contracts, in an amount to be determined by a Jury and pre- and post-judgment interest thereon in the amount of 8% per anum;

i.  Compensation for emotional distress suffered by the Plaintiff, Kirk D. Ladner, as direct and proximate result of Defendants' misconduct and breach of the July 15, 2012 Contract, in an amount to be determined by a Jury and pre- and post-judgment interest thereon in the amount of 8% per anum;

j.  Attorneys' fees and expenses, and incidental costs, incurred by the Plaintiffs, and each of them, for having to pursue litigation to enforce their rights under the subject Contracts, and each of them, all of which were foreseeable to the Defendants and which are necessary to accomplish the Mississippi Supreme Court's stated purpose in establishing a remedy for breach of contract claims, in an amount to be determined by a Jury and/or by the Court, and pre- and post-judgment interest thereon in the amount of 8% per anum; and

k.  All other damages to be shown at the trial of this matter.

174.  Through each of the wrongful acts described above, Defendants, and each of them, have willfully and wantonly wronged the Plaintiffs, and each of them, or have treated them with such gross and reckless negligence, or in such a reckless disregard for their rights as is equivalent to such a wrong, and/or which rises to the level of an independent tort, as described above, thereby entitling the Plaintiffs to punitive damages in a sum to be determined by a Jury in this cause, in an amount which is sufficient to deter these Defendants, and others similarly situated, from engaging in similar conduct in the future and to reward these Plaintiffs for bringing such conduct to light.  In the event Plaintiffs are awarded punitive damages, Plaintiffs are also entitled

to recover additional attorneys' fees and expenses in a reasonable amount to be determined by the Court, as a matter of law.

WHEREFORE PREMISES CONSIDERED, Plaintiffs, and each of them, demand judgment against Defendants, and each of them, jointly and severally, for actual, compensatory, statutory and punitive damages, in an amount to be determined by a Jury in this cause and/or the Court, together with pre-judgment and post-judgment interest as provided by law, attorneys' fees and costs of this action, and any and all additional relief in favor of the Plaintiffs deemed appropriate by this Honorable Court.

Respectfully submitted, this the 24th day of November, 2014.

**SCOTT WALKER, Individually and d/b/a Maxwell & Walker Consulting Group, LLC and/or d/b/a Precision Marketing Group, LLC; STEVE SEYMOUR, Individually and d/b/a Diamond Consulting and/or d/b/a Precision Marketing Group, LLC; and KIRK LADNER, Individually and d/b/a The Ladner Group and/or d/b/a Precision Marketing Group, LLC**

BY:*Christopher C. Van Cleave*
　　CHRISTOPHER C. VAN CLEAVE MSB #  10796

　　*Clyde H. Gunn, III.*
　　CLYDE H. GUNN, III, (MSB #5074)

　　*W. Corban Gunn*
　　W. CORBAN GUNN, (MSB #101752)

　　*David N. Harris, Jr.*
　　DAVID N. HARRIS, JR. (MSB #100790)

Clyde H. Gunn, III, (MSB #5074)
Christopher C. Van Cleave, (MSB #10796)
W. Corban Gunn, (MSB #101752)
David N. Harris, Jr. (MSB #100790)
CORBAN, GUNN & VAN CLEAVE, PLLC
Post Office Drawer 1916
Biloxi, Mississippi 39533-1916
Telephone:  (228) 432-7826
Facsimile:  (228) 456-0998

buddy@cgvclaw.com
christopher@cgvclaw.com
corban@cgvclaw.com
david@cgvclaw.com

## CERTIFICATE OF SERVICE

I, Christopher C. Van Cleave, do hereby certify that on this date I electronically filed with the Clerk of Court through the ECF system, a true and correct copy of the above and same forwarded via the ECF system to:

Joe Sam Owen
OWEN, GALLOWAY & MYERS, PLLC
1414 25th Avenue
Post Office Drawer 420
Gulfport, Mississippi 39502-0420
Telephone: (228) 868-2821
Facsimile: (228) 864-6421

Jacob O. Malatesta
J. Michael Coleman
Hagwood Aldelman Tipton PC
One LeFleur's Square
4735 Old Canton Road, Suite 111
P. O. Box 14188
Jackson, MS 39236-4188
Telephone: (601) 608-6300
Facsimile: (601) 362-3642

Carl Hagwood
Hagwood Aldelman Tipton PC
540 Main Street, Suite 403 (38701)
P. O. Box 4537
Greenville, MS 38704-4537
Telephone: (662) 335-5555
Facsimile: (662) 335-5700

**ATTORNEYS FOR JIMMY WILLIAMSON AND JIMMY WILLIAMSON, PC**

George W. "Billy" Shepherd
Stephen R. Bailey
Allison Standish Miller
Lamar G. Sellers
Shepherd, Scott, Clawater & Houston, LLP
2777 Allen Parkway, 7th Floor
Houston, Texas 77019
Telephone: (713) 650-6600
Facsimile: (713) 650-1720

William E. Whitfield, III
Copeland, Cook, Taylor & Bush, PA
P. O. Box 10
Gulfport, MS 39502
Telephone: (228) 863-6101
Facsimile: (228) 863-9526

**ATTORNEYS FOR MICHAEL POHL, INDIVIDUALLY AND
D/B/A THE LAW OFFICE OF MICHAEL A. POHL**

This the 24th day of November, 2014.

By:     __*s/ Christopher C. Van Cleave*__
         CHRISTOPHER C. VAN CLEAVE (MSB#10796)