**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SCOTT WALKER, Individually and/or  d/b/a**
**Maxwell & Walker Consulting Group, LLC**
** and/or d/b/a  Precision Marketing Group, LLC;**
**STEVE SEYMOUR, a/k/a Stephen Seymour,**
**Individually and/or d/b/a Diamond Consulting**
**and/or d/b/a Precision Marketing Group,**
**LLC;**
**KIRK D. LADNER, Individually and d/b/a The Ladner Group**
**and/or d/b/a Precision Marketing Group, LLC;**
**and PRECISION MARKETING GROUP, LLC**                                    **PLAINTIFFS**

**VERSUS**                                                   **CAUSE NO: 1:14-cv-381-KS-JCG**

**JIMMY WILLIAMSON, Individually and/or**
**as the owner/member/officer of Jimmy Williamson, P.C.,**
**and/or as a partner/member of the law firm Williamson & Rusnak;**
**JIMMY WILLIAMSON, P.C., Individually and/or**
**as a partner/member of the law firm Williamson & Rusnak;**
** MICHAEL A. POHL, Individually and/or**
**d/b/a The Law Office of Michael A. Pohl;**
**CYNDI RUSNAK, Individually and/or**
**as the  owner/member/officer of  Cyndi Rusnak, PLLC,**
**and/or as a partner/member of the law firm Williamson & Rusnak;**
**CYNDI RUSNAK, PLLC, Individually and/or**
**and/or as a partner/member of the law firm Williamson & Rusnak;**
**ROBERT E. AMMONS, Individually and/or**
**as the owner/member/officer of The Ammons Law Firm, LLP; and**
**THE AMMONS LAW FIRM, LLP**                                        **DEFENDANTS**

**PRECISION MARKETING GROUP, LLC'S AMENDED COMPLAINT**

        **COMES NOW** the Plaintiff, **PRECISION MARKETING GROUP, LLC**, by  and

through undersigned counsel, and files this its Complaint against the Defendants, JIMMY

WILLIAMSON;  JIMMY   WILLIAMSON, P.C.; MICHAEL  POHL;  CYNDI  RUSNAK:

CYNDI RUSNAK, PLLC; ROBERT E. AMMONS; AND THE AMMONS LAW FIRM, LLP.

## PARTIES

1.   SCOTT WALKER, is an adult resident citizen of Ocean Springs, Jackson County, Mississippi.

2.   Plaintiff, STEVE SEYMOUR, a/k/a Stephen Seymour, is an adult resident citizen of Kiln, Hancock County, Mississippi.

3.   Plaintiff, KIRK D. LADNER, is an adult resident citizen of Diamondhead, Hancock County, Mississippi.

4.   PRECISION MARKETING GROUP, LLC is a Mississippi limited liability company with its principal place of business located at 7044 Stennis Airport Road, Kiln, Mississippi 39556.

5.   JIMMY WILLIAMSON, is an adult resident citizen of the State of Texas, and a Texas Lawyer who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Mr. Williamson may be served with process in the manner provided by law.

6.   JIMMY WILLIAMSON, P.C. is a Texas Professional Corporation, with its principal place of business located at 4310 Yoakum Blvd, Houston, Texas, 77006, which committed a tort and/or breached contracts in whole or in part in the State of Mississippi. On information and belief, Texas resident Jimmy Williamson, who serves as its designated Registered Agent, Director, and President, is the only member of the Professional Corporation. Jimmy Williamson, P.C. may be served with process in the manner provided by law.

7.   MICHAEL A. POHL is an adult resident citizen of the State of Texas, and a Texas Lawyer in good standing, enrolled in the Texas Bar with Bar Number 16086300, who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Mr.

Pohl may be served with process in the manner provided by law.

8.    CYNDI RUSNAK is an adult resident citizen of the State of Texas, and a Texas Lawyer who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Cyndi Rusnak may be served with process in the manner provided by law.

9.    CYNDI RUSNAK, PLLC is a Texas Professional Corporation, with its principal place of business located at 4310 Yoakum Blvd, Houston, Texas, 77006, which committed a tort and/or breached contracts in whole or in part in the State of Mississippi. On information and belief, Texas resident Cyndi Rusnak, who serves as its designated Registered Agent, is the only member of the Professional Corporation. Mr. Pohl may be served with process in the manner provided by law.

10.    ROBERT E. AMMONS is an adult resident citizen of the State of Texas, and a Texas Lawyer, who committed a tort and/or breached contracts in whole or in part in the State of Mississippi. Robert Ammons may be served with process in the manner provided by law.

11.    THE AMMONS LAW FIRM, LLP is a Texas limited liability partnership, with its principal place of business located at 3700 Montrose Boulevard, Houston, Texas, 77006, which committed a tort and/or breached contracts in whole or in part in the State of Mississippi. On information and belief, Texas resident Robert, who serves as its designated Registered Agent, Director, and President, is the only member of the Professional Corporation. Jimmy Williamson, p.c. Mr. Pohl may be served with process in the manner provided by law.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under the provision of Title 28, United States Code § 1332, in that this suit is a civil action between citizens of different States wherein the matter and actual controversy exceeds the sum value of $75,000.00, exclusive

of interest and costs.

13.    Venue of this civil action is appropriate in this Court pursuant to Title 28, United States Code, § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Mississippi.

## FACTS

14.    Jimmy Williamson was one of the ten trial attorneys selected to bring suit in Phase I of the BP/Deepwater Horizon case and, as such, participated in the negotiations of the settlement. By virtue of that position, Williamson had special access to information about the settlement and its terms.

15.    Williamson practiced law in Texas under the law firm name of Williamson & Rusnak, through his corporate entity, Jimmy Williamson P.C. His law partner, Cyndi Rusnak, also practiced law in Texas under the law firm name of Williamson & Rusnak, through her corporate entity, Cyndi Rusnak, PLLC. The office of the law firm of Williamson and Rusnak was located at 4310 Yoakum Boulevard, Houston, Texas 77006.

16.    In early 2012, Williamson contacted Pohl to discuss whether Pohl could find BP/Deepwater Horizon claimants for Williamson and Rusnak to represent. At first, Pohl was not interested, as his focus was on representing victims of motor vehicle accidents. Williamson met with Pohl three times, and finally persuaded Pohl to work with him.

17.    Pohl and Williamson agreed to and did form a joint venture to find, sign up and represent BP/Deepwater Horizon claimants. Jimmy Williamson, P.C., Williamson & Rusnak, Cyndi Rusnak and/or Cyndi Rusnak, PLLC were co-venturers in the Williamson/Pohl joint venture along with Pohl and Williamson.

18.    In all times referenced in this Second Amended Complaint, Williamson acted on his

own behalf and as the authorized and/or apparent agent for Jimmy Williamson, P.C.; the law firm of Williamson & Rusnak; Cyndi Rusnak, PLLC; Cyndi Rusnak; and/or the Williamson/Pohl joint venture.

19.     Under the joint venture agreement, Pohl's role was to fund, facilitate and manage the marketing efforts.  His primary responsibility was to obtain clients for the Williamson/Pohl joint venture.  Expenses which Pohl incurred in the furtherance of his joint venture duties were to be borne by him.  In return, Pohl was to receive 40% of the attorney fees resulting from the claims as a result of the joint venture's representation.

20.     Under the joint venture agreement, Williamson's role was to provide direction for the joint venture's marketing efforts, based on his unique knowledge of the BP/Deepwater Horizon Settlement.   Williamson was to decide which groups of claimants should be targeted; direct the joint venture's marketing efforts; provide marketing materials to use in soliciting potential clients; and meet with and market himself to claimants with larger claims. Williamson would also bear some of the expenses of the marketing efforts.   Williamson would also be lead counsel when filing the clients' claims. Williamson would contract with claimants through his professional corporation, Jimmy Williamson, P.C., with Pohl as associate counsel.

21.     Under the joint venture agreement, Williamson, Jimmy Williamson, P.C., Cyndi Rusnak, Cyndi Rusnak, PLLC and/or Williamson & Rusnak would bear the costs and effort of filing, prosecuting and otherwise processing the clients' claims. The claims were to be processed through Williamson & Rusnak, Williamson's and Rusnak's law firm, located in Houston, Texas.

22.     Under   the   Williamson/Pohl   joint   venture   agreement,   Williamson,   Jimmy

Williamson, P.C., Williamson & Rusnak, Cyndi Rusnak, PLLC and/or Cyndi Rusnak were to receive sixty percent of the attorney fees generated by the joint venture, to be split among them.  Expenses which Williamson, Jimmy Williamson, P.C., Williamson & Rusnak, Cyndi Rusnak, PLLC and/or Cyndi Rusnak incurred in the furtherance of their joint venture duties were to be borne by them.

23.    On behalf of the Williamson/Pohl, joint venture, Pohl met with Scott Walker in Pascagoula, Mississippi in early April, 2012.  Pohl described the Williamson/Pohl joint venture, telling Walker that Pohl had "partnered with 30 year friend Jimmy Williamson" to represent companies, entities, and people affected by the BP Oil Spill.  Pohl told Walker that Williamson was "one of ten attorneys who settled the 7.8 billion dollar claim against BP."  Pohl informed Walker that Williamson's goal was to represent 100 Deepwater Horizon claimants in Mississippi.

24.    On behalf of the Williamson/Pohl joint venture, Pohl recruited Scott Walker to provide marketing services to potential clients for the Williamson/Pohl joint venture.  Walker was part owner of Maxwell-Walker Consulting Group, LLC ("Maxwell Walker"), a marketing/public relations firm on the Mississippi Gulf Coast.  Pohl informed Walker that he and Williamson wanted to conduct the marketing operations through Walker's company, Maxwell Walker.

25.    Williamson and Pohl flew to Mississippi several days later to meet with Walker to discuss the arrangement.  Williamson and Pohl agreed to retain Walker, individually, as well as his company, to market the services of the Williamson/Pohl joint venture to potential BP/Deepwater Horizon Settlement claimants.

26.    The Williamson/Pohl joint venture retained Walker and/or Maxwell Walker to

identify potential BP/Deepwater Horizon claimants; to promote Williamson to potential claimants, to facilitate meetings between Williamson and potential clients; and to administer Williamson/Pohl's other marketing efforts.

27.     In return, the Williamson/Pohl joint venture promised to pay Walker a percentage of Pohl's attorney fees which were generated by claims obtained through the marketing efforts; expenses; plus a $10,000 flat fee.

28.     On behalf of the Williamson/Pohl joint venture, Pohl began immediately paying Walker's monthly retainer as per their agreement with him.

29.     The Williamson/Pohl joint venture began operation with Williamson's instructions to Walker to target seafood companies, fishermen, and Zone A claimants who, under the terms of the settlement, were exempt from having to prove causation.   Walker went to work marketing to claimants as per Williamson's instructions.

30.     Williamson and Pohl flew to Mississippi on numerous occasions in April-May 2012 to meet with Walker and to meet with claimants whom Walker had lined up for them.  From April 2012 through mid-July 2012, Williamson came to Mississippi at least every two weeks, if not weekly.   As just one example of such a trip, on April 23, 2012, Williamson chartered a private plane to fly to Mississippi, where he and Pohl met with Walker and a representative of the Mississippi Gulf Coast seafood industry for dinner at the Private Wine Room at Ruth's Chris Steakhouse in Biloxi. Williamson paid for the plane and for the costs of entertaining at Ruth's Chris, in furtherance of the Williamson/Pohl joint venture.

31.     On behalf of the Williamson/Pohl joint venture, Pohl directed Walker to set up a process whereby Walker created invoices for "fees and expenses" on Maxwell Walker's letterhead.  Maxwell Walker submitted those invoices weekly to Pohl.  Pohl paid the invoices.

32.     Through Walker, Williamson and Pohl met Dane Maxwell (not a party to this action).  Dane Maxwell is and was the president of two companies which provided services relating to regulatory compliance, certification and safety issues in the commercial trucking industry.

33.     In early May 2012, Williamson and Pohl recruited Dane Maxwell to solicit BP/Deepwater Horizon claimants in the trucking industry.  On behalf of the Williamson/Pohl joint venture, Pohl agreed to pay Dane Maxwell $1,000 for each BP/Deepwater Horizon claimant he signed up for Williamson and Pohl, plus expenses.  Dane Maxwell quickly signed up numerous trucking company clients with large claims for the Williamson/Pohl joint venture.

34.     Pohl had also an ongoing, separate joint venture with Robert E. Ammons, a Houston, Texas attorney, who practiced law in Texas through his law firm, The Ammons Law Firm, LLP.  The purpose of the Pohl/Ammons joint venture was to represent clients with personal injury claims arising out of motor vehicle accidents.  Pohl, Robert Ammons and/or The Ammons Law Firm, LLP had an agreement under which Pohl would find and obtain clients for the joint venture, and Ammons and/or The Ammons Law Firm would prosecute the claims.  Pohl, Ammons and/or The Ammons Law Firm would share the resulting attorney fees.

35.     When Pohl discovered the nature of Dane Maxwell's trucking businesses, Pohl retained Dane Maxwell to do separate contract work for the Pohl/Ammons joint venture.  On behalf of the Pohl/Ammons joint venture, Pohl retained Dane Maxwell to find, solicit and sign up potential clients who had been involved in accidents with trucking companies.  Maxwell's work for Pohl/Ammons joint venture eventually expanded to include soliciting and signing up

clients with personal injury claims arising out different types of motor vehicle accident cases. On behalf of the Pohl/Ammons joint venture, Pohl agreed to pay Dane Maxwell a flat fee for each motor vehicle accident client which Maxwell signed up for the Pohl/Ammons joint venture. On behalf of the Pohl/Ammons joint venture, Pohl also agreed to pay all of the expenses of Dane Maxwell in furtherance of these activities.

36.    On behalf of the Pohl/Ammons joint venture, and also on behalf of the Williamson/Pohl joint venture, Pohl instructed Dane Maxwell to submit his fees and expenses (including a claim for "bonuses" which Pohl paid Dane Maxwell from time to time) to Pohl through a "pass-through" arrangement which Pohl set up with Maxwell Walker.    In accordance with the "pass-through" arrangement, Maxwell Walker created invoices for the amounts which Dane Maxwell provided.   Maxwell Walker then sent the invoices to Pohl. Pohl would pay that amount of money to Maxwell Walker.   Maxwell Walker then paid the money Pohl sent to Dane Maxwell.

37.    On behalf of the Williamson/Pohl joint venture, and on behalf of the Pohl/Ammons joint venture, Pohl agreed to pay Maxwell Walker a "pass-through" fee" of 3% of all payments and funds which Maxwell Walker administered through its accounts for Pohl in this manner.   Pohl did not explain to Walker or Maxwell Walker why he paid any of the funds to Dane Maxwell, and/or any of the others which Pohl later paid through the same arrangement. Neither Walker nor Maxwell Walker had discretion as to the amount or timing of payments, but followed Pohl's directions.   When Walker or any of the other Plaintiffs questioned why Pohl was paying Dane Maxwell so much money, Pohl said that he had a special arrangement with Dane Maxwell that was none of their concern.

38.    Pohl ultimately "passed through" to Dane Maxwell approximately $3.6 million

through his arrangement with Maxwell Walker (and later, Precision Marketing Group, LLC.). Part of that $3.6 million was in furtherance of the Williamson/Pohl joint venture, since it pertained to Dane Maxwell's marketing efforts to potential BP/Deepwater Horizon claimants. Part of the $3.6 million paid to Dane Maxwell in the pass-through arrangement pertained to Dane Maxwell's marketing efforts for the Pohl/Ammons joint venture

39.    Dane Maxwell assembled a team of contract workers to provide marketing services for both the Deepwater Horizon claimants and car accident victims.  Pohl paid the fees and expenses for these workers through his "pass through" arrangement with Maxwell Walker.

40.    Scott Walker and Dane Maxwell had so much early success in procuring BP/Deepwater Horizon claimants that the Williamson/Pohl joint venture quickly exceeded its initial goal of signing up 100 Mississippi clients.  Williamson and Pohl particularly noticed that Dane Maxwell had achieved good results with the team of contract workers he supervised. Williamson and Pohl decided to expand their marketing efforts. Williamson and/or Pohl instructed Walker to recruit more contract workers to market to Deepwater Horizon claimants for them.

41.    Williamson and/or Pohl told Walker that the Williamson/Pohl joint venture would pay the expenses of the workers, plus a flat fee of $50 to $300 based on the size of the claim. Pohl was to pay these additional workers through his "pass through" arrangement with Maxwell Walker.

42.    In early May 2012, the Williamson/Pohl joint venture recruited Steve Seymour for their marketing efforts.  On May 8, 2012, Pohl and Walker met with Steve Seymour at Trapani's Eatery in Bay St. Louis, Mississippi.  On behalf of the Williamson/Pohl joint venture, Pohl agreed to pay all of Seymour's marketing expenses; pay Seymour 12% of all

attorney fees Pohl received from the Williamson/Pohl joint venture; and pay Seymour a retainer of $7,500 per month until the attorney fees began coming in.

43.    On May 19, 2012, Williamson, Pohl, Walker and Seymour met at Logan's Steakhouse in Gulfport, Mississippi. Walker had lined up potential clients to meet Williamson, and Williamson held meetings with them, one after another, at Logan's Steakhouse.

44.    On that day, Williamson gave Walker and Seymour a stack of color flyers touting Williamson's experience in the Deepwater Horizon case, and promoting the legal services of Williamson, Jimmy Williamson PC, and/or Williamson & Rusnak. Williamson also gave them blank copies of client representation contracts.

45.    Williamson directed Walker and Seymour to find potential clients; promote the services of the Williamson/Pohl joint venture; and obtain clients for the joint venture. Williamson stated that he would fly to Mississippi to personally meet with clients with larger claims.  Williamson stated that he had a power point presentation to show potential clients that was "very good", and that "no one could top it."

46.    Williamson directed them to send copies of executed client contracts to his office by email, and to keep the originals in Mississippi.  Williamson told them that Pohl would handle the money and the public relations for the joint venture, and would pay the compensation for Walker and Seymour.  Williamson stated that he, Williamson, was going to handle the overhead expenses, including intake and staffing for the Williamson/Pohl joint venture. Williamson told Walker and Seymour that they were each going to earn millions of dollars from their agreed share of Pohl's fees from the Williamson/Pohl joint venture.

47.    Approximately the second week of May 2012, Pohl, on behalf of the Williamson/Pohl joint venture, requested that Walker and Seymour meet with him.  On May

22, 2012, the three of them met at the Hampton Inn in Biloxi, Mississippi. Pohl informed Walker and Seymour that he and Williamson had recruited Terry Robinson to solicit claimants for them. The Williamson/Pohl joint venture had agreed to pay Robinson's marketing expenses, plus 6% of all attorney fees Pohl received as a result of the Williamson/Pohl joint venture, regardless of who solicited the claims for the joint venture. Robinson did not get a monthly retainer.

48. The Williamson/Pohl joint venture's compensation agreements with Walker and Seymour remained the same. Robinson's compensation would not reduce the fees that the Williamson/Pohl joint venture would pay to Walker and Seymour out of Pohl's fees. Walker and Seymour would each get 12%, and Robinson would get 6%, of all fees which Pohl received from the Williamson/Pohl joint venture, regardless of whether one of them, Dane Maxwell, or any other contract worker brought in the client.

49. During the May 22, 2012 meeting, Pohl informed Walker/Seymour/Robinson that he and Williamson wanted a writing to protect themselves. Pohl told them that special ethical rules prevented attorneys from sharing fees with non-lawyers, but that it "happened all the time." Of course, no law precluded Walker, Seymour, and Robinson from splitting fees with an attorney. Pohl told them that the writing would set out the agreed percentage of attorney fees which the Williamson/Pohl joint venture owed to each of them, but that it would indicate that Walker/Seymour/Robinson were working for an unspecified hourly rate for "public relations services." Pohl assured Walker/Seymour/Robinson that the writing was intended only to "cover"  Pohl and Williamson in case questions later arose about the propriety of their splitting attorney fees with non-lawyers. Pohl assured them that the writing would have no effect on the Williamson/Pohl joint venture's existing agreement to pay them the monthly

retainer and then share in Pohl's attorney fees. Pohl assured them that, regardless of what was in the written document, the Williamson/Pohl joint venture would pay Walker/Robinson/Seymour their agreed percentage of attorney fees, in addition to their expenses and the monthly retainer.

50. Pohl assured Walker/Seymour Ladner that all of this was entirely legal and proper. Pohl told Walker/Seymour that Mississippi attorneys had reviewed and approved these procedures.

51. While in Mississippi in Walker's presence, Pohl dictated the document over the telephone to Maizie Arnold in his office.

52. On May 25, 2012, Pohl met Walker at the Gulfport Regional Airport at Gulfport, Mississippi with the writing he had drafted, which he induced Walker to sign. Seymour and Robinson subsequently signed it. A true and correct copy of the writing has been filed as [Doc. 19-2] and is incorporated herein by reference.

53. Pohl began paying the monthly retainer to Seymour and Walker, pursuant to their oral agreement with the Williamson/Pohl joint venture.

54. Walker/Seymour/Robinson continued their marketing efforts to potential clients for the Williamson/Pohl joint venture. Williamson actively managed the marketing efforts of Walker/Seymour/Robinson. Walker spoke with both Williamson and/or Pohl at least once a day, and often many times a day. Williamson came to Mississippi approximately once a week to meet with clients which Walker/Seymour/Robinson had lined up for him. For instance, on or about May 31, 2012, Walker picked up Williamson at the Beau Rivage Casino Hotel in Biloxi, Mississippi, and chauffeured Williamson around to several meetings which Walker had scheduled with potential Mississippi clients.

55.     Among the potential claimants whom Walker and Seymour identified was Kirk Ladner.  Ladner owned several business entities with potential Deepwater Horizon claims. Ladner had already selected an attorney to represent him on the claims.  However, Ladner agreed to meet with Williamson.

56.     In early June 2012, Ladner met with Williamson at the Silver Slipper Casino in Bay St. Louis, Mississippi. Ladner chose to not to hire the Williamson/Pohl joint venture for representation regarding his Deepwater Horizon Claims.   However, Williamson was impressed with Ladner's knowledge of the details of the Deepwater Horizon Settlement. Williamson was also impressed that Ladner had extensive contacts in the seafood industry. Williamson told Ladner that he would make a good addition to Williamson's marketing team.

57.     Approximately a week later, Williamson and Pohl met with Ladner at Trapani's Restaurant in Bay St. Louis, Mississippi to persuade him to use his seafood industry contacts to market the services of Williamson and Pohl to potential BP/Deepwater Horizon claimants. Ladner agreed to set up meetings with potential clients for the Williamson/Pohl joint venture.

58.     Ladner was successful in setting up meetings for Williamson with potential clients in Easton, Maryland.  On behalf of the Williamson/Pohl joint venture, Williamson asked Ladner to go with him to the meetings. Ladner agreed to go to Maryland with Williamson for several days for a flat fee of $8,000 to meet with these potential clients.   On behalf of the Williamson/Pohl joint venture, Williamson agreed to pay Ladner the requested fee.

59.     Williamson chartered a private plane to take them to Maryland. Ladner, Seymour and Walker met Williamson at the Gulfport, Mississippi regional airport, and they all flew to Maryland for numerous meetings over several days.   Due to Ladner's successful marketing to these potential clients, Williamson was able to sign up five large claims. Williamson told

Walker/Seymour/Robinson that "if the three of you continue signing me clients like this, you will each be very rich, very soon."   On behalf of the Williamson/Pohl joint venture, Williamson paid all of the expenses of the trip including, but not limited to, rental cars, hotel rooms, and meals.   On behalf of the Williamson/Pohl joint venture, Pohl paid Ladner his agreed fee of $8,000.

60.   After Ladner succeeded in getting them large claims in Maryland, Williamson and Pohl recruited Ladner to providing marketing services clients for their joint venture on a full-time basis. Two days after Ladner returned from the Maryland trip, he met with Pohl, Walker, and Seymour at Bacchus Restaurant in Gulfport, Mississippi.  Ladner agreed to solicit clients for the Williamson/Pohl joint venture.  On behalf of the Williamson/Pohl joint venture, Pohl agreed to pay Ladner $5,000 for each large claim he obtained for them, and $1,000 for each small claim.

61.   In the next few weeks, Ladner succeeded in obtaining thirteen new clients for the Williamson/Pohl joint venture.  Impressed with the scope of Ladner's knowledge about the Deepwater Horizon Settlement, and with the effect that knowledge had on potential clients, Williamson and/or Pohl asked Ladner to teach classes to their other workers.  By this time, the Williamson/Pohl joint venture had teams of contract workers in numerous states marketing to potential claimants.  At the request of Williamson and/or Pohl, Ladner taught classes to their workers in numerous cities including, but not limited to, Biloxi, Mississippi; Key West, Florida; Tampa, Florida; Gulf Shores, Alabama; Mobile, Alabama; and Shreveport, Louisiana.

62.   Williamson was the *de facto* general manager of the Williamson/Pohl joint venture marketing efforts. Williamson directed the marketing efforts of Walker/Seymour/Ladner. Williamson had daily telephone conversations with Walker/Seymour/Ladner, and they also

communicated constantly with Williamson's office staff. Williamson traveled to Mississippi approximately every week or so. Williamson also traveled to meet Walker/Seymour/Ladner and/or the contract workers at locations in other states.

63.   Williamson instructed Walker/Seymour/Ladner to send the contract workers after specific groups of potential claimants, such as oyster harvesters, crab fishermen, restaurants and hotels, non-profit organizations, chicken farmers, rice farmers, and essentially all businesses in Zone A.   Williamson particularly urged them to find claimants in certain geographic areas.

64.   Williamson continued to travel to Mississippi every week or two to meet with Walker/Seymour/Ladner and/or potential clients which they had scheduled for meetings with the Williamson/Pohl joint venture.   For example, in the first week of June, Walker spent two days with Williamson meeting potential clients in Mississippi whom Walker had lined up for him.   The week of June 17, 2012, Williamson came to Mississippi to meet with potential clients which Walker/Seymour/Ladner had lined up for him, starting off with a breakfast meeting on June 17, 2012 at Phoenicia Restaurant in Ocean Springs, Mississippi with a potential client. Williamson also traveled to Mississippi on numerous other occasions to meet with clients obtained for him by the efforts of Walker/Seymour/Ladner. Williamson traveled to Mississippi for meetings with representatives of the City of Gulfport; Ingall's Shipbuilding; the Gulfport Biloxi International Airport; Habitat for Humanity; Jimmy Levens Builders, and many other large Mississippi businesses or entities which were the result of  marketing services provided by Walker/Seymour/Ladner.   Walker and Seymour attended many of the meetings and observed Williamson put on his power point presentation touting the advantages of hiring the Williamson/Pohl joint venture for representation.

65.     Walker/Seymour/Ladner also introduced Williamson and Pohl to Mississippi lawyers interested in creating a joint venture with Williamson and Pohl to represent Deepwater Horizon claimants.  For example, Walker/Seymour/Ladner set up a dinner meeting between Pohl, Walker, Seymour, the Stone County Attorney and the Stone County Board of Supervisors at Vrazel's Restaurant in Gulfport, Mississippi on June 10, 2012.  At that meeting, it was agreed that the Stone County Attorney would form a joint venture with Pohl and Williamson in the representation of Stone County, Mississippi's Deepwater Horizon Settlement claim.  Pohl, Williamson and the Stone County Attorney subsequently entered into a Joint Venture Agreement following that meeting, under which Pohl and Williamson would advance all expenses associated with the representation, and would share attorney fees with the Stone County Attorney. Walker and Seymour also introduced Williamson and Pohl to other Mississippi lawyers, and facilitated the formation of joint ventures between Williamson and Pohl and those lawyers.

66.     By the end of June 2012, Williamson and Pohl were impressed with Ladner and told him they wanted to add him to "the team."  Williamson and Pohl stated that they wanted to fire Robinson because he was not obtaining any clients.   Robinson agreed to terminate his agreement with the Williamson/Pohl joint venture, with the understanding that he would be paid his share of the attorney fees which came in on the claims already signed up to that point.

67.     Williamson and Pohl took this opportunity to renegotiate the compensation to Walker and Seymour.  On behalf of the Williamson/Pohl joint venture, Pohl agreed to pay Ladner, Walker, and Seymour each 7.5% of all attorney fees Pohl received pursuant to the Williamson/Pohl joint venture, which were the result of marketing efforts by them, Dane Maxwell, or any of the contract workers.  On behalf of the Williamson/Pohl joint venture,

Pohl agreed to pay Ladner, Walker, and Seymour monthly retainers (Walker and Ladner, $10,000; Seymour $7,500) until the attorney fees started coming in; and to pay all of their expenses.   In addition, Pohl was to continue to pay to Maxwell Walker a 3% "pass-through fee" on money which Pohl passed through Maxwell Walker to pay for expenses and for the contract workers including, but not limited to, Dane Maxwell.

68.     The week of July 2, 2012, Williamson traveled to Mississippi to meet with more clients which Walker/Seymour/Ladner had obtained as a result of their marketing efforts for the Williamson/Pohl joint venture.   Williamson, Walker, Seymour and Ladner met in Mississippi during Williamson's visit.   Williamson continued to assure Walker/Seymour/Ladner that they would each make millions of dollars from their share of the attorney fees received by the Williamson/Pohl joint venture.   Williamson told Walker/Seymour/Ladner that he wanted them to execute another writing similar to the May 25, 2012 document.  Williamson wanted a writing setting out a purported hourly arrangement to protect himself and Pohl if the fact that they were splitting fees with non-lawyers came to the attention of the Bar.

69.     On July 30, 2012, Pohl met Ladner/Walker/Seymour at the Gulfport Regional Airport and presented them with a written document on behalf of the Williamson/Pohl joint venture. As before, Pohl asserted that he had to draft the documents a certain way to avoid an ethical rule which precluded attorney from splitting fees with non-lawyers. Pohl assured them that there was no law which prevented Ladner/Walker/Seymour from splitting fees with an attorney, that their agreement was completely legal, and that the only concern was avoiding problems with an ethical rule which applied only to Williamson and Pohl. Pohl explained that the written agreement would reference the agreed fee split with Ladner/Walker/Seymour but,

in order to protect Pohl and Williamson from unpleasant inquiries, Pohl and Williamson wanted the agreement to suggest that their compensation was based on some undefined "hourly" rate. Pohl affirmed to Ladner/Walker/Seymour that, when the attorney fees came in, their compensation would be calculated as the agreed percentage and that they would be paid their agreed percentage of attorney fees. Pohl represented that, although it was "unethical" for the lawyers to split attorney fees with them, their agreement with the joint venture was entirely legal. Pohl represented that all of this had been "vetted" by Mississippi lawyers and was entirely legal and proper. Pohl induced Ladner/Walker/Seymour to sign the writing.

70.    By that point, the Williamson/Pohl joint venture had signed up approximately 1,128 Deepwater Horizon claimants as a result of the marketing efforts of Walker/Seymour/Ladner.

71.    On or about August 1, 2012, on behalf of the Williamson/Pohl joint venture, Williamson provided Walker/Ladner/Seymour with fifty leather-bound binders containing material promoting Williamson and his law firm. Williamson/Pohl instructed Walker/Ladner/Seymour to give the leather binders to the potential clients with larger claims. Williamson created the binders and delivered them to Walker/Seymour/Ladner in Mississippi.

72.    The binder contained, among other items, material touting Williamson's position as a BP/Deepwater Horizon trial attorney, and information about the Deepwater Horizon Settlement. The contents of the binder are filed as [Doc. 19-5], and are incorporated herein by reference.

73.    The binder's cover page was a color picture of the Deepwater Horizon oil rig topped by the caption "Michael A. Pohl Attorney at Law." The binder contained Pohl's business cards. The binder contained Pohl's curriculum vitae.

74.    The first document in the binder was a letter dated August  1, 2012, on the letterhead

of Williamson & Rusnak, signed by Williamson.  Williamson's business card was in the bottom, left hand corner of the inside of the cover, and stated that his law firm was Williamson & Rusnak.  The binder contained Williamson's curriculum vitae. The binder contained renditions of the Powerpoint presentation Williamson used in his meetings with potential clients.

75.   Williamson's letter directed the potential client to his website, jimmywilliamson.com. That website address was directed to land on the website of Williamson & Rusnak.

76.   Williamson's letter stated that the binder contained "our contract of employment." The binder contained a blank "CONTRACT OF EMPLOYMENT" on the combined letterhead of Jimmy Williamson, P.C. and Michael A. Pohl.  The Contract stated that the client was signing a contract with Jimmy Williamson, P.C. and Michael A. Pohl for joint representation by them.   The contingency fee contract  made it clear that Williamson and Pohl would share in any losses and/or profits related to their  joint representation of the client, and required any and all sums recovered on the clients' behalf to be  paid  to Jimmy Williamson, P.C.  for disbursement.

77.   From summer 2012 through the end of the year, the marketing efforts for the Williamson/Pohl joint venture were in full swing. The Williamson/Pohl joint venture operated up to thirty contract workers in numerous states, administered through Maxwell Walker. As a result of the efforts of Walker/Seymour/Ladner, the Williamson/Pohl joint venture received more than 200 signed contracts in an average week.

78.   Pursuant to the instructions of Williamson and/or Pohl, the workers presented the signed client contracts to Maxwell Walker. Maxwell Walker emailed copies of the contracts to Williamson's office, and mailed hard copies to Pohl's office.  Maxwell Walker kept the

originals of the contracts. Walker/Seymour/Ladner communicated regularly with Williamson and his office staff regarding the contracts and the claims.

79.    The Williamson/Pohl joint venture instituted a specific process by which they paid the contract workers, and how much the workers were paid for each contract. When the contract worker submitted the client's signed contract to Maxwell Walker, the worker would estimate the size of the claim, and also submit his or her own expenses for reimbursement. On Thursday of each week, Maxwell Walker would calculate the amount Williamson/Pohl owed to the contract workers based on a scale established by Williamson/Pohl.  The worker's fee was based on the size of the claim, as estimated by the worker who signed it up. Maxwell Walker would draw up an invoice listing the fees and expenses due to the workers that week, along any expenses incurred by Walker/Seymour/Ladner, and send the invoice to Pohl on Thursday. On Friday, Pohl wired to Maxwell Walker the amount of the invoice, along with the 3% pass-through fee for administering the funds.  Later that day, Maxwell Walker paid the money to the workers.

80.    Through his position at the Deepwater Horizon Settlement, Williamson continued to have special access to information, particularly as to which groups of claimants were getting large settlements, and where such claimants were located.  Williamson continued to direct the marketing efforts. Williamson identified groups of potential claimants, and decided which geographic areas the organization should target. For instance, Williamson was particularly interested in Key West, Florida, and on numerous occasions directed the group to focus their efforts there.  Williamson continued to meet Walker/Seymour/Ladner and clients they had obtained, not only in Mississippi, but in numerous states.

81.    Throughout the summer of 2012, Williamson traveled to Mississippi and other states

to meet Walker/Seymour/Ladner on a regular, almost weekly basis. By September 2012, Williamson was only coming to Mississippi about once every four to six weeks.  However, he continued to relay his instructions to Walker/Seymour/Ladner through Pohl, who also lived in Houston, Texas, and who met with Williamson regularly.   On occasion, Walker/Seymour/Ladner also traveled to Houston, Texas for meetings with Williamson and Pohl.  Williamson also had Walker/Seymour/Ladner travel to New Orleans to meet with him at his BP/Deepwater Horizon Settlement office.

82.    Walker/Seymour/Ladner continued to communicate with Williamson on a daily basis via telephone, text message and email.  For example, in a September 3, 2012 email to Williamson and Pohl, Walker informed them that he was trying to set up a meeting for them with an accounting firm in Gulfport, Mississippi to discuss representing approximately eighty of the firm's clients.  By return email that same day, Williamson responded, "Sweet.  Happy to do it this week."

83.    Williamson had full knowledge of and approved Pohl's agreement to pay Walker/Seymour/Ladner a percentage of Pohl's attorney fees, as compensation for their marketing work for the Williamson/Pohl joint venture. Williamson repeatedly reminded Walker/Seymour/Ladner that the more cases they brought in for Williamson/Pohl, the more money that Walker/Seymour/Ladner would make.  As just one specific example, on October 2, 2013, while standing next to his hired car and driver in the parking lot of Habitat for Humanity in Gulfport, Mississippi, at approximately 12:00 p.m., Williamson, on behalf of all Defendants, told Ladner, Walker and Seymour that they were performing "good work", and that their continuing efforts were going to "add to the millions of dollars [Plaintiffs] are going to make."

84.    In September or October 2012, Walker/Seymour/Ladner questioned Pohl several times about the amounts that Pohl was paying to Dane Maxwell through Pohl's "pass through" arrangement.  Each time, Pohl stated that he had a special arrangement with Dane Maxwell, and that they should submit Maxwell's invoices to Pohl without question.

85.    Due to the marketing and administrative efforts of Walker/Seymour/Ladner, the Williamson/Pohl joint venture was signing up millions of dollars of claims each week.  As an example, in just the first week of October 2012, Walker/Seymour/Ladner sent Williamson and Pohl contracts for claims worth an estimated $12,753,000.

86.    In approximately October 2012, Walker/Seymour/Ladner met with Williamson and his law partner, Cyndi Rusnak, at the Houston, Texas office of their law firm, Williamson and Rusnak.  Jimmy Williamson and Cyndi Rusnak gave Walker/Seymour/Ladner a tour of the law firm's processing center for BP/Deepwater Horizon claims, which they had set up in a building behind their regular law office.   Williamson and Rusnak paid to set up the processing center and paid for the staff to run it.    At that point, Williamson and Rusnak had approximately twenty staff people working on the claims Walker/Seymour/Ladner had procured for the Williamson/Pohl joint venture.

87.    Cyndi Rusnak had actual knowledge that Walker/Seymour/Ladner were providing marketing services for the Williamson/Pohl joint venture, and that the Williamson/Pohl joint venture had agreed to pay Walker/Seymour/Ladner a percentage of the attorney fees resulting from the claims in return for that work. Cyndi Rusnak personally confirmed to Walker/Seymour/Ladner that the Williamson/Pohl joint venture would pay them their agreed percentage of the attorney fees from the claims.

88.    At all times mentioned in this Second Amended Complaint, Cyndi Rusnak acted on

her own behalf, as well as the actual, authorized and/or apparent agent of Cyndi Rusnak, PLLC and Williamson & Rusnak.

89.    Jimmy Williamson; Jimmy Williamson, P.C.; Cyndi Rusnak; Cyndi Rusnak, PLLC; and the law firm of Williamson & Rusnak each received a portion of the attorney fees from the representation of the BP/Deepwater Horizon claimants obtained by Walker/Seymour/Ladner, Dane Maxwell and/or the contract workers.   Jimmy Williamson; Jimmy Williamson, P.C.; Cyndi Rusnak; Cyndi Rusnak, PLLC; and the law firm of Williamson & Rusnak were co-venturers in the Williamson/Pohl joint venture.

90.    After touring Williamson's claim processing center, Walker/Seymour/Ladner had lunch with Williamson and Pohl. Williamson showed Walker/Seymour/Ladner a spreadsheet calculating the estimated value of the approximately 1,280 claims which the Williamson/Pohl joint venture had signed up to that point as a result of Walker/Seymour/Ladner's marketing efforts. Williamson boasted that the BP/Deepwater Horizon Settlement committee was approving approximately 96% of the amounts he was asserting on the claims. Williamson told them that, based on his calculations, Walker/Seymour/Ladner had procured approximately $112 million worth of claims for the Williamson/Pohl joint venture up to that point.

91.    Since the attorney fees on the claims were at least 25% of the amount recovered, the Williamson/Pohl joint venture would have expected to recover approximately $28 million in attorney fees just on the cases signed up to that point.   Under the Williamson/Pohl joint venture's agreement with Walker/Seymour/Ladner, Walker/Seymour/Ladner could each expect to receive over $1.1 million as compensation for their marketing efforts just up to that point.   Williamson informed them that the numbers did not even include some recent cases which his staff had not yet put into his spreadsheet.   Williamson praised the work of

Walker/Seymour/Ladner and told them that they would become rich men if they continued to obtain claimants for the Williamson/Pohl joint venture.

92.   As Williamson became busier at his office processing the thousands of new claims which Ladner/Walker/Seymour produced for him, Williamson traveled less often to Mississippi to meet with them.  However, Ladner/Walker/Seymour continued to rely entirely on Williamson to direct their marketing efforts. Ladner/Walker/Seymour relied on Williamson to tell them what kinds of clients to look for, where to look for them, how to market to clients, and what information they needed to get from the clients. Pohl had no real knowledge of the Settlement.  Pohl's role in the joint venture was to fund and facilitate the marketing efforts. Williamson often spoke to Walker/Seymour Ladner on the telephone, and also relayed instructions to them through Pohl.  At all times, Williamson continued to lead and direct the marketing efforts of the Williamson/Pohl joint venture. Williamson encouraged Ladner/Walker/Seymour to travel more to other states to solicit claims.  Williamson also frequently updated the representation contracts, and provided Ladner/Walker/Seymour with numerous versions of the blank joint venture contracts to hand out to the workers and potential clients.  Williamson provided Ladner/Walker/Seymour with regular reports regarding the status of the claims they signed up for him. For example, Williamson informed Ladner/Walker/Seymour when clients they had signed up had terminated his representation, so that Maxwell Walker could deduct the payment from the worker's payments for those clients.

93.   Near the end of 2012, Williamson and Pohl realized that they were overpaying their contract workers for soliciting claims. The Williamson/Pohl joint venture paid each worker a flat fee based on the worker's own estimate of the size of the claim he had signed up. Williamson/Pohl realized that some workers were inflating the size of the claim, and some

workers were submitting duplicate claims.   Also, Williamson was concerned about the workload that the duplicate and improperly documented claims was placing on the Williamson & Rusnak office staff in Houston, Texas.   Williamson/Pohl decided that their marketing organization needed closer management.

94.   Williamson/Pohl directed Walker/Seymour/Ladner to set up a limited liability company in their own names in order to manage Williamson/Pohl's contract workers. Pursuant to Williamson/Pohl's instructions, Walker and Ladner formed Precision Marketing Group, LLC in January 2013.   On behalf of the Williamson/Pohl joint venture, Pohl leased space for the new company in the Hancock Bank building in Gulfport, Mississippi, and paid to set up an office with equipment and staff.   The entire purpose of forming Precision Marketing Group, LLC ("PMG") was to administer and manage the Williamson/Pohl joint venture's contract worker organization, which had grown to approximately thirty contract workers in different states.

95.   The Williamson/Pohl joint venture's "pass-through" arrangement for paying the contract workers moved from Maxwell Walker to PMG.   The mechanics of the operation remained essentially the same.   The workers marketed the legal services of Williamson/Pohl to potential claimants.   The workers submitted the signed Williamson/Pohl contracts to PMG, along with their estimate of the size of the claim and their expenses.   The new part of the process required the staff of PMG to review each such contract to determine if the size of the claim seemed accurate, and to look for duplications and other problems.   Williamson created guidelines for the PMG staff as to what kind of documentation he required, and the PMG staff checked each claim to make sure that the worker had gotten the proper information to submit with the contract.   PMG would then send copies of the acceptable contracts, with the

claimants' information, to both Williamson and Pohl.  PMG would send Pohl weekly invoices for the fees and expenses owed to the workers, and the expenses of the office and staff, and Pohl would wire the money to PMG to be paid out.  Pohl also paid PMG $1,000 each week to cover incidental expenses.

96.    The Pohl/Ammons's "pass-through" arrangement for paying the Dane Maxwell and other contract workers also moved to PMG.

97.    From its inception in January 2013 through October 2014, PMG provided services to the Williamson/Pohl joint venture and the Pohl/Ammons joint venture.   From its inception in January 2013 until October 2014, Pohl, on behalf of Williamson/Pohl joint venture and the Pohl/Ammons joint venture, entirely funded all of the operations of PMG and controlled all aspects of PMG, including, but not limited to, leasing the office space, making staff hiring decisions; dictating the invoicing and payment structure; dictating and controlling the marketing activities; and requiring that all business decisions be approved by Pohl.

98.    On January 22, 2013, Williamson identified to Walker/Seymour/Ladner specific individuals and entities involved in the seafood business that were seeking representation on BP/Deepwater Horizon claims, and urged Walker/Seymour/Ladner to increase their marketing efforts.

99.    In January 2013, Walker/Ladner/Seymour discovered that some of the clients they had obtained for the Williamson/Pohl joint venture had received checks from Williamson for their Deepwater Horizon claims.  However, the Williamson/Pohl joint venture had not paid Walker/Ladner/Seymour the agreed percentage of the attorney fees, nor even informed them that attorney fees had been received on the claims.

100.    Walker/Ladner/Seymour confronted Pohl, who admitted that some attorney fees had

come in and that Ladner/Seymour/Walker were entitled to a percentage of these fees pursuant to their agreement with the Williamson/Pohl joint venture.

101.   Pohl also informed Ladner/Walker/Seymour that, in accordance with their agreement with the Williamson/Pohl joint venture, he was terminating their monthly retainers since the attorney fees were beginning to come in, and they should start receiving their portions of the attorney fees.   Pohl did terminate their monthly retainers.

102.   On January 28, 2013, Pohl met Walker at the Bacchus Restaurant in Gulfport, Mississippi.   Pohl informed Walker/Seymour/Ladner that he had spoken to Williamson, who had given Pohl a list of attorney fees received by the Williamson/Pohl joint venture to date. Pohl represented that the Williamson/Pohl joint venture only owed $6,000 to Walker/Seymour/Ladner as their agreed percentage of Pohl's attorney fees.   Pohl refused to give Walker/Seymour/Ladner any accounting of how Pohl had calculated the amount owed to Walker/Seymour/Ladner.

103.   Pohl directed Walker/Seymour/Ladner to submit an invoice to Pohl for $6,000 under PMG's name to Pohl.   Pohl instructed Walker/Seymour/Ladner that, in order to shield Pohl and Williamson from ethical issues, the invoice should say that the $6,000 was for work at the rate of $1,500 per hour.   During the meeting, Pohl encouraged Walker/Seymour/Ladner to continue obtaining new clients, stating that the new goal of the Williamson/Pohl joint venture was that Walker/Seymour/Ladner should obtain enough cases to generate $100 million in legal fees.

104.   On February 1, 2013, pursuant to Pohl's instructions, PMG submitted an invoice to Pohl for $6,000, which stated that it was for marketing services rendered at the rate of $1,500 per hour.   Pohl paid the invoice by wire transfer on February 25, 2013.

105.   In next few months, Williamson and Pohl continued to represent that the amount of attorney fees they were receiving from the claims was very low, and continued to refuse to provide any sort of accounting to Walker/Seymour/Ladner.  Walker/Seymour/Ladner confronted Pohl and Williamson on several occasions about claims which Walker/Seymour/Ladner knew had been paid by the BP/Deepwater Horizon Settlement. Walker/Seymour/Ladner questioned why they were not receiving their agreed share of the attorney fees which the Williamson/Pohl joint venture was receiving. After such a confrontation, Pohl sometimes agreed to pay Walker/Seymour/Ladner their agreed shares of fees, but still refused to provide any accounting.

106.  Pohl informed Walker/Seymour/Ladner verbally of the amounts which the Williamson/Pohl joint venture purportedly owed to them, but understated the true amount. Walker/Seymour/Ladner had no way to verify Pohl's statements regarding their agreed share of Pohl's fee.

107.  From February 22, 2013 through June 30, 2013, Pohl, on behalf of the Williamson/Pohl joint venture, instructed Walker/Seymour/Ladner to submit invoices to Pohl as a "cover" for the funds which Pohl would pay them as their agreed share of the attorney fees. Following Pohl's instructions, PMG submitted eight more invoices to Pohl, for a total amount of $85,250.   Pohl paid          $57,000 against those invoices, which Walker/Seymour/Ladner split between them.

108.   Pohl and Williamson continued to encourage Walker/Seymour/Ladner to obtain more claims for the Williamson/Pohl joint venture.  Williamson told Walker/Seymour/Ladner on numerous occasions that their percentage of the total attorney fees would make them rich men.

109.   After July 2013, the Williamson/Pohl joint venture did not pay any of the agreed

compensation for the BP/Deepwater Horizon Settlement claims to Walker/Seymour/Ladner, and refused to provide them with any information about the attorney fees coming in on the claims.  Walker/Seymour/Ladner repeatedly demanded that Williamson/Pohl pay them their agreed share of the attorney fees.

110.   Despite the fact that Williamson and Pohl had breached their agreement with Walker/Seymour/Ladner and failed to pay them their agreed fees, the Williamson/Pohl joint venture wanted Walker/Seymour/Ladner to continue to sign up claims for them.   On September 9, 2013, on behalf of the Williamson/Pohl joint venture, Pohl paid Walker/Seymour/Ladner $50,000 as an incentive for them to keep working, although Pohl still refused to provide them any information about attorney fees which the Williamson/Pohl joint venture and/or Pohl had received.

111.   On October 2, 2013, Williamson met with Walker/Seymour/Ladner in Mississippi with a prospective client they had obtained for him. At that meeting, Williamson assured Walker/Seymour/Ladner on behalf of the Williamson/Pohl joint venture that they would receive their agreed percentage of the attorney fees, and again stated that Walker/Seymour/Ladner would make "millions" from their agreed share of the attorney fees.

112.   In Fall 2013, the BP/Deepwater Horizon Settlement halted payments to claimants due to a pending appeal.  The Williamson/Pohl joint venture continued to operate its marketing efforts for a time.   However, in early December 2013, Williamson informed Walker/Seymour/Ladner that the appeal would take a long time to work through the Supreme Court, and that it would create a "long, dry spell" in terms of attorney fees to the Williamson/Pohl joint venture.

113.   By this time, the Williamson/Pohl joint venture had signed up more than 10,000

viable claims which Walker/Seymour/Ladner had obtained for them.  As a result of the efforts of Walker/Seymour/Ladner, the Williamson/Pohl joint venture signed up claims collectively worth more than $600 million.

114.   In December 2013, Williamson and Pohl decided to terminate the Williamson/Pohl joint venture's marketing efforts.  Williamson instructed Ladner/Walker/Seymour to terminate the workers soliciting claims in various states, to fire the temporary office staff, and to close the PMG office.

115. From that point on, Williamson ceased communicating with Ladner/Walker/Seymour.   Pohl represented to Walker/Seymour/Ladner that Williamson was withholding all attorney fees and refusing to communicate with him, as well. Neither Pohl nor Williamson paid the agreed fees to Walker/Seymour/Ladner.

116.   In January 2014, frustrated at Williamson's and Pohl's failure to honor their agreement with Walker/Seymour/Ladner, Walker created a series of eighteen invoices on the letterhead of Precision Marketing Group, one for each month from July 2012 through December 2013, for the marketing services of Ladner/Walker/Seymour at the hourly rate of $1,500.  The invoices totaled over eight million dollars.  On or about January 22, 2014, Walker sent the invoices to Williamson/Pohl. The invoices are filed as [Doc. 19-8], and are incorporated here by reference.

117.   On behalf of the Pohl/Ammons joint venture, Pohl was still operating his personal injury marketing organization.  Pohl had separately instructed Ladner/Walker/Seymour not to shut down the PMG office entirely, but to keep it open with one staff person, and to retain certain of the contract workers.   On behalf of the Pohl/Ammons joint venture, Pohl continued to pay the expenses of PMG, and to operate his marketing activities for personal injury claims

through PMG.

118.  In early 2013, Pohl and Dane Maxwell had terminated their special arrangement. Subsequently, Pohl had a meeting with Ladner/Walker/Seymour.  Pohl informed them that his "main business" was representing rollover clients.  Pohl asked them to start marketing to "rollover" accident claimants on behalf of the Pohl/Ammons joint venture.   On behalf of the Pohl/Ammons joint venture, Pohl agreed to pay Walker/Seymour/Ladner, collectively, up to thirty percent of the attorney fees Pohl received from the cases, plus expenses.  Pohl instructed them to submit their expenses for this work through PMG alongside the BP/Deepwater Horizon Settlement marketing expenses. From early 2013 through October 2014, Ladner/Seymour/Walker conducted marketing efforts to obtain personal injury clients for the Pohl/Ammons joint venture.

119.  Ladner/Seymour/Walker also provided management services for the Pohl/Ammons joint venture's contract workers and administered payment of the contract workers' fees and expenses through PMG. On behalf of the Pohl/Ammons joint venture, Pohl agreed to pay PMG a 3% "pass-through" fee on all amounts which Pohl paid through PMG for fees and expenses of the Pohl/Ammons joint venture's marketing efforts.

120.  In early 2014, Ladner/Walker/Seymour threatened to stop their marketing activities for the Pohl/Ammons joint venture since Pohl had failed to pay the agreed fees on the BP/Deepwater Horizon Settlement claims. To assuage their objections and keep his marketing efforts going, Pohl paid them $50,000 on March 9, 2014.   Pohl directed Ladner/Walker/Seymour to send him two receipts --- one for the March 9, 2014 payment and one for Pohl's prior September 9, 2013 payment of $50,000.  Pohl instructed Walker that the receipts should state that they were payments on the first of the eighteen invoices

Ladner/Walker/Seymour had submitted to him on January 22, 2014. Walker complied with Pohl's demand and sent Pohl the requested invoices, backdating the one for the prior September 2013 payment.

121.  In approximately April 2014, Terry Robinson learned from some of the clients he had signed up that they had received payments on their claims.  However, Williamson/Pohl had not paid Robinson his agreed share of the attorney fees. Robinson demanded that the Williamson/Pohl joint venture pay him his agreed share of Pohl's attorney fees.  Pohl, Williamson and Robinson agreed to mediate their dispute in New Orleans, Louisiana in August 2014.

122.  Walker/Seymour/Ladner continued to press Pohl to pay them their agreed compensation based on a percentage of Pohl's attorney fees from the Williamson/Pohl joint venture.  On or about June 1, 2014, Pohl told them that he had retained Chris Flood, a Texas attorney based in Houston, to represent Pohl and Williamson. Pohl informed them that Flood would be calling them to discuss their agreed fees. On or about June 4, 2014, Chris Flood telephoned Seymour.  During the conversation, Flood repeatedly assured Seymour that the agreements between Walker/Seymour/Ladner and the Williamson/Pohl joint venture were valid and enforceable, and that Williamson/Pohl intended to pay them in full.

123.  On June 21, 2014, Pohl made a third payment to Walker/Seymour/Ladner in the amount of $50,000.  As an inducement to keep Walker/Seymour/Ladner working on marketing for the Pohl/Ammons joint venture, Pohl promised, on behalf of the Williamson/Pohl joint venture, that more payments were forthcoming on the Williamson/Pohl joint venture claims.

124.  In August 2014, Williamson and Pohl held the mediation with Robinson in New

Orleans. Pohl asked Ladner, Walker and Seymour to attend the mediation, suggesting that they might have some influence with Robinson which could aid Pohl.  Pohl had replaced Chris Flood with a new lawyer, Billy Shepherd, who attended the mediation, as well.

125.   Immediately prior to the mediation, Ladner spoke briefly once to Robinson at Pohl's request.  However, during the mediation, Ladner, Walker and Seymour were segregated in a separate room and did not participate in the negotiations.  Ladner, Walker and Seymour had no contact with any of the parties during the mediation.  After the mediation, Pohl informed Ladner, Walker and Seymour that Pohl had settled Robinson's claims.

126.   Approximately a week after the mediation concluded, Pohl informed Ladner, Walker and Seymour that Pohl and/or Williamson had agreed to pay Robinson the amount of $235,000 to settle his claims against the Williamson/Pohl joint venture.

127.   When Seymour and Walker learned that Robinson was getting $235,000 for his share of the Williamson/Pohl joint venture attorney fees, they demanded that Williamson/Pohl also pay them, as well.  Since their agreement with the Williamson/Pohl joint venture allotted each of them twice the share of attorney fees due to Robinson, Seymour and Walker expected Williamson/Pohl to pay each of them $470,000.

128. However, Pohl represented to Walker/Seymour/Ladner that Williamson was withholding the attorney fees from Pohl, so that Pohl was unable to pay Walker and Seymour. Pohl admitted that he was holding $187,000 in attorney fees which Williamson had disbursed to him as attorney fees received by the Williamson/Pohl joint venture.  Pohl claimed, however, that Williamson had simply sent Pohl checks, without stating which clients they were for, or how much the total attorney fee was for each claim.  Pohl stated that Williamson refused to provide him with any information about the claims. Pohl asserted that he could not pay

Ladner/Walker/Seymour their agreed fees until Williamson paid him, and provided him with the information necessary to calculate their share of his fees.  Pohl assured them that he and Williamson would eventually pay them their agreed share of the attorney fees.  Billy Shepherd also, on behalf of the Williamson/Pohl joint venture, assured Walker/Seymour/Ladner that Pohl and/or Williamson would pay them their agreed portion of Pohl's attorney fees.

129.   In October 2013, Plaintiff Scott Walker was indicted on an unrelated felony charge. In November 2013, while they were in a meeting in Houston, Texas with Pohl, Pohl informed Walker/Seymour/Ladner that Williamson wanted to have lunch with them.

130.   During that lunch, Williamson explained that, due to Walker's indictment, Williamson wanted to "distance" himself from them.  Williamson then took Walker aside. Williamson stated to Walker that he was concerned that the federal authorities might ask Walker about Williamson's "relationship" with Walker/Seymour/Ladner.   Williamson suggested to Walker different ways Walker should respond to the federal authorities if they questioned him about Williamson so as to not implicate Williamson in a crime.  Williamson affirmed to Walker/Seymour/Ladner that they would continue to receive their agreed percentage of the attorney fees from the Williamson/Pohl joint venture.

131.   After that meeting, Williamson refused to communicate further with Walker/Seymour/Ladner.

132.   After Walker was indicted, Williamson abruptly terminated his representation of approximately 9,000 of the 10,000 or so clients he had procured through the Plaintiffs' services.    Williamson terminated these clients regardless of the viability or recovery value of the claims, or his duty to those clients.   Williamson terminated these 9,000 or so claims even though he had represented some of the clients for more than a year and half, and certain

Deepwater Horizon/BP Settlement deadlines were approaching.

133.    In the eighteen months prior to Walker's indictment, Williamson had rejected and/or terminated only approximately 350 of the approximately 10,000 clients (approximately 3.5%) which he had procured through the Plaintiffs' services.  The reason that Williamson abruptly terminated his representation of the approximately 9,000 clients was to avoid possible scrutiny of his activities by federal law enforcement and/or other agencies, as part of investigations which he feared would ensue after Walker's indictment.  Also, his fear that the authorities would discover his fee-splitting arrangement with the Plaintiffs motivated Williamson to terminate the 9,000 or so clients so he would not have to pay the Plaintiffs their just fees for their services.  Williamson continued to refuse and fail to pay the Plaintiffs their agreed fees on the claims on which he did collect fees.

134.   The Plaintiffs' agreed services were completed as to each of the clients Williamson terminated.    Williamson terminated the representation of those clients in order to avoid having to pay the Plaintiffs their agreed fees.  Williamson terminated those clients in an attempt to avoid scrutiny of law enforcement and other agencies regarding his activities. Williamson intentionally failed to pursue the object of the joint venture's agreement with the Plaintiffs, and  deprived the Plaintiffs of their intended benefit under the agreement. Williamson terminated the representation in a bad faith breach of the joint venture's agreement with the Plaintiffs to pursue attorney fees in the claims, and to pay Plaintiffs out of those claims. The Williamson/Pohl joint venture still owes the Plaintiffs fees as to those claims.

135.   Pohl took some of the clients which Williamson had terminated, and sent them to other attorneys for representation, under an arrangement in which Pohl would receive a

portion of the attorney fees.  These attorneys included, but were not limited to: Eric Nielsen; Ray Burke; Michelle Wan; and Linda Thomas.  Since the Plaintiffs' agreed services were completed as to each of those clients, the Williamson/Pohl joint venture still owes the Plaintiffs fees as to those claims.

136.   In Spring 2014, on behalf of the Pohl/Ammons joint venture, Pohl reached an agreement with Walker/Seymour/Ladner for them to provide marketing services to the joint venture to potential personal injury clients with claims arising from ignition failures in General Motors cars.

137.   On behalf of the Pohl/Ammons joint venture, Pohl agreed to pay Walker/Seymour/Ladner, collectively, thirty percent of the attorney fees Pohl received from the Pohl/Ammons joint venture on GM ignition failure cases which resulted from their marketing efforts.

138.   Ladner/Seymour/Walker also provided management services for the Pohl/Ammons joint venture's contract workers and administered payment of the contract workers' fees and expenses through PMG.

139.   Once again, Pohl informed Walker/Seymour/Ladner that Pohl needed a document to protect himself in case the Bar learned that he was splitting fees with non-lawyers.  Pohl drafted an "Operating Agreement" in which Pohl purportedly agreed to pay the GM Settlement Verification Team, LLC an unspecified hourly rate "not to exceed thirty percent" of Pohl's attorney fees.  Pohl assured Walker/Seymour/Ladner that the prohibition on splitting fees only applied to him, as an attorney, and that everything he was suggesting was legal and proper.   Pohl told Walker/Seymour that he had had Mississippi attorneys review and approve this process.   Walker, Ladner and Pohl signed the Operating Agreement on July 1, 2014.

140.   From Spring 2014 through October 2014, Ladner/Seymour/Walker conducted marketing efforts to obtain "GM ignition failure" clients for the Pohl/Ammons joint venture. Walker/Seymour/Ladner provided marketing services to the Pohl/Ammons joint venture and succeeded in obtaining new clients for the joint venture.

141.   On behalf of the Pohl/Ammons joint venture, Pohl instructed Walker and Ladner to form two limited liability companies in Mississippi under their own names. One was Helping Hands Group, LLC and the other was GM Settlement Verification Team, LLC. Pohl conducted various "pass-through" activities under the auspices of those two companies.  Pohl funded, managed, controlled and operated the business of those two companies.  Pohl instructed Walker and Ladner how to set up the companies and how the businesses would work. Pohl instructed them to set up a website and print brochures, and provided them with the content. Pohl provided all of the financing for the companies.  Pohl used the two companies to "pass-through" payments to various persons and entities.

142.   Through September 2014, Walker/Seymour/Ladner procured through their marketing services approximately sixty car accident (including, but not limited to, rollover and GM ignition failure) cases for the Pohl/Ammons joint venture.  Almost immediately, Pohl and Ammons began receiving attorney fees from those cases. However, Pohl did not pay any of the agreed share of his fees to Walker/Seymour/Ladner.

143.   Shortly thereafter, the Plaintiffs filed this lawsuit.

144.   The Defendants have received millions of dollars of attorney fees as a result of the Plaintiffs' services.

145.   All conditions precedent required of the Plaintiffs to recover have been met, satisfied, and/or waived by the Defendants.

146.   On or about May 12, 2015, after commencing this action, the Plaintiffs assigned their choses of action and/or their interests in this action to Precision Marketing Group, LLC. A true and correct copy of the writing has been filed as [Doc. 75-1] and is incorporated herein by reference.

147.   Precision Marketing Group, LLC filed its Notice of Assignment of Chose in Action on or about May 12, 2015 in this lawsuit. A true and correct copy of the writing has been filed as [Doc. 75] and is incorporated herein by reference.

148.   Precision Marketing Group, LLC, as the sole and bona fide owner of all claims and interests asserted in this action, is the real party in interest.

**CHOICE OF LAW**

140.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

141.  Plaintiffs' Complaints contain allegations that sound in tort, and those that sound in Contract.

142.  Defendants committed each of the torts described herein, including but not limited to the independent tort of bad faith, in the State of Mississippi.  The foreseeable injuries and damages caused by Defendants have been suffered in Mississippi, and no State has a more substantial interest in applying its law to the resolution of those injuries and damages than Mississippi.  In addition to being the State where the subject injuries occurred, Mississippi is where the place where the conduct of the Defendants that caused those injuries occurred, is the residence of all three Plaintiffs, and served as the center of operations for the business of Defendants' Partnerships/Joint Ventures.  The relationship by and between the Defendants and the Plaintiffs is centered in Mississippi.

143.   The place of performance and the subject matter of the subject contract is located in Mississippi.  Each of the subject Contracts involved promises to pay Mississippi residents for services to be rendered in Mississippi and elsewhere – but primarily in the State of Mississippi. Defendants utilized office space in Mississippi (first Gulfport then Mississippi) paid for by Pohl, and furnished by Pohl, which space was referred to by Pohl as his "Mississippi", "Gulfport" and/or "satellite" "law office", as the center of operations for the business of the Joint Ventures and the subject Contracts. Defendants delivered brochures, letters and other documents to Plaintiffs, in Mississippi, to be delivered to Mississippi residents or Mississippi businesses in Mississippi; for the purpose of inducing Mississippi businesses and/or residents to hire Pohl / Williamson to handle their BP oil spill claims.  Defendants, and each of them, repeatedly traveled to Mississippi to meet with Plaintiffs, as well as representatives of Mississippi entities and/or businesses to fulfill the business of the subject Partnership.  As a direct and proximate result of the services performed by the Plaintiffs that form the basis of this Complaint, Defendants represented and/or represent thousands of Mississippi businesses, entities, cities, municipalities and/or County's in their BP oil spill claims.  As a direct and proximate result of the services performed by the Plaintiffs that form the basis of this Complaint, Defendants associated numerous Mississippi law firms and Mississippi lawyers to jointly represent hundreds of Mississippi businesses and residents with BP Oil Spill claims.  The limited payments made to Plaintiffs by the Defendants have been delivered to Plaintiffs in the State of Mississippi. Invoices for those services were prepared in Mississippi.

144. Each of the Plaintiffs is a resident of Mississippi, and Mississippi has the greatest interest in fashioning the remedies recoverable by its residents as a result of the actions of out of state individuals and entities who voluntarily came to Mississippi; and who in Mississippi

induced Plaintiffs to materially change their positions to their detriment and to perform months'
worth of work and services in reliance of promises of compensation made by the Defendants in
Mississippi.  Although Defendants are Texas citizens, they chose to leave Texas to set up shop in
Mississippi, and centered the business and operations that are the subject matter of this
Complaint in Mississippi.

145.  Additionally, and in the alternative, the promises made to Plaintiffs by Defendants upon
which Plaintiffs relied to substantially change their positions in order to provide the services
requested by Defendants in expectation of being compensated as set forth herein above, were
made to Plaintiffs by Defendants in Mississippi.

146.  Had Defendants wished to have any disputes which may arise under those contracts
resolved pursuant to Texas law, they could and should have incorporated such provisions into the
terms of the contracts.  They did not do so.  As lawyers, Defendants know, or should have
known, that drafting contracts in the State of Mississippi, and signing contracts in the State of
Mississippi for services to be provided primarily in the State of Mississippi, would lead those
contracts to be interpreted in accordance with Mississippi law in the absence of terms to the
contrary.

147.  Considering a maximization of relevant contacts, and the applicable sections of the
Restatement dealing with actions sounding in tort and those sounding in contract, Mississippi has
the most significant relationship to the underlying events and parties and/or the greatest concern
with the specific issues (compensation for injuries suffered in Mississippi caused by torts
committed in Mississippi; and enforcing the contractual rights of Mississippi Residents and a
Mississippi limited liability company under written contracts negotiated and executed in
Mississippi and/or oral contracts made in Mississippi) with respect to the liabilities and rights of

the parties to this action.  As such, to the extent that it can be shown that there is a material difference in Mississippi law and the law of some other State whose law Defendants may seek to invoke, Mississippi law applies to all substantive issues of law raised by this Complaint and/or any and all defenses thereto.

## COUNT I:  JOINT VENTURE / CO-PRINCIPALS

148. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

149. As described in the factual assertions above, Jimmy Williamson, Jimmy Williamson, P.C., Michael Pohl, Cyndi Rusnak, Cyndi Rusnak, PLLC, and the law firm of Williamson & Rusnak intended to and did form, and at all material times were acting as, a Joint Venture with regard to the business of representing clients and resolving claims (for profit) arising from the Deepwater Horizon oil spill.  The primary expressed purpose of that Joint Venture was to represent obtain and represent clients with BP/Deepwater Horizon oil spill claims for the goal of sharing resulting attorney fees.

150. As set forth with particularity above, Defendants each: expressed their intent to be for the joint venture; had the right to participate and did participate in the business of the partnership; had an agreement to contribute and did contribute money, property and/or services to the joint venture; had the right to share and did share in the profits of the business of the joint venture; and agreed to share in any losses or liabilities of the business of the joint venture.

151. Also pursuant to statutory and common law, Pohl, Williamson, Jimmy Williamson, P.C., Rusnak and Cyndi Rusnak are each individually, and jointly and severally, liable for any and all injuries and damages of the Plaintiffs described in this Complaint.

152. Additionally, and in the alternative, as set forth with particularity above, Jimmy

Williamson and/or Jimmy Williamson, P.C exercised sufficient dominion and/or control over Michael Pohl and/or participated directly with Pohl such that Pohl was said Defendants' agent and/or was a co-principal with said Defendants, such that Defendants, and each of them, are individually and jointly and severally liable for any and all damages and injuries of the Plaintiffs described herein.

153.  As described in the factual assertions above, Michael Pohl, Robert Ammons and The Ammons Law Firm, LLP intended to and did form, and at all material times were acting as, a Joint Venture with regard to the business of representing personal injury clients and resolving their claims (for profit).   The primary expressed purpose of that Joint Venture was to represent obtain and represent clients with personal injury claims for the goal of sharing resulting attorney fees.

154.  As set forth with particularity above, Defendants each: expressed their intent to be for the joint venture; had the right to participate and did participate in the business of the partnership; had an agreement to contribute and did contribute money, property and/or services to the joint venture; had the right to share and did share in the profits of the business of the joint venture; and agreed to share in any losses or liabilities of the business of the joint venture.

155.  Also pursuant to statutory and common law, Pohl, Ammons and The Ammons Law Firm, LLP are each individually, and jointly and severally, liable for any and all injuries and damages of the Plaintiffs described in this Complaint.

156.  Additionally, and in the alternative, as set forth with particularity above, Ammons and The Ammons Law Firm, LLP exercised sufficient dominion and/or control over Michael Pohl and/or participated directly with Pohl such that Pohl was said Defendants' agent and/or was a co-

principal with said Defendants, such that Defendants, and each of them, are individually and jointly and severally liable for any and all damages and injuries of the Plaintiffs described herein.

### COUNT II:  BREACH OF CONTRACT, and THE INDEPENDENT TORTS OF BAD FAITH, AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

157.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

158.  As described with particularity above, Plaintiffs fulfilled all their duties and obligations under their contracts and agreements with the Defendants. The Defendants had a duty to compensate the Plaintiffs in accordance with the contracts and agreements.

159.  As described with particularity above, Defendants, and each of them, breached their duties under the subject Contracts, and each of them, unreasonably failing to pay the fees and expenses due thereunder, and simply refused to pay the majority of fees and expenses due thereunder without any legitimate or arguable reason. Defendants also wrongfully deprived the Plaintiffs of their expected contractual benefits by improperly terminating ninety percent of the clients which the Plaintiffs procured for them,  for the improper purpose of evading their duties to the Plaintiffs and avoiding the notice of the authorities.

160.  As described with particularity above, Defendants, and each of them, breached their duties under the subject contracts and agreements.

161.  As a result of the Defendants' breach of the contracts and agreements, the Plaintiffs incurred damages.

162.  As described with particularity above, Defendants, and each of them, engaged in conduct that rises to the level of an independent tort, and acted with gross and/or reckless disregard for the rights of the Plaintiffs, and each of them, to the financial advantage of Defendants and financial determinant of the Plaintiffs.

163. Defendants, and each of them, are liable for the acts and/or omissions described throughout this Complaint, which include but are not limited to:

    a.  Acting in conscious, gross and/or reckless disregard for the rights of the Plaintiffs, and each of them, as described with particularity throughout this Complaint; and

    b.  Acting wrongfully in other respects to be shown upon a trial of this cause.

164. The actions of Defendants, and each of them, constitute breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, reckless disregard, rendering said Defendants liable to the Plaintiffs, and each of them, for actual, compensatory and punitive damages.

165. As a direct, proximate and foreseeable consequence of Defendants', and each of their, breach of contract, bad faith breach of contract, breach of the duty of good faith and fair dealing, reckless disregard, negligence and/or gross negligence, Plaintiffs were injured and damaged as described throughout this Complaint, for all of which Plaintiffs, and each of them, are entitled to be compensated by the Defendants, jointly and severally.  Under applicable law, Plaintiffs are entitled to be compensated by the Defendants for all of these damages, and other incidental damages incurred as a result of having to pursue this litigation.

166. Defendants' bad faith conduct, as described in the preceding paragraphs, rises to the level of an independent tort, and/or represents reckless disregard for the rights of the Plaintiffs, and each of them; such that Plaintiffs, and each of them, are entitled to recover punitive damages from the Defendants, and each of them, in an amount sufficient to punish the Defendants and serve as an example to deter these Defendants and similarly situated individuals and entities from engaging in such conduct in the future; and to reward Plaintiffs for bringing Defendants' misconduct to light.

## COUNT III:  QUANTUM MERUIT / UNJUST ENRICHMENT

167. By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

168.  Additionally, and in the alternative, to the extent that one or all of the subject contracts are not legally enforceable, and/or that some of the services performed by Plaintiffs that are described in this Complaint are not covered by one of the subject Contracts, Plaintiffs are entitled to recover compensation and expenses from the Defendants, and each of them, pursuant to the theories of Quantum Meruit and/or Unjust Enrichment.

169. As alleged with particularly above, at all material times Plaintiffs provided valuable services to Defendants, and each of them, in connection with Defendants' Joint Ventures' business of representing individuals and entities and resolving their legal claims for profit.

170. Defendants sought the services of the Plaintiffs and entered into contracts and agreements with Plaintiffs.  Defendants accepted the services rendered by the Plaintiffs, and repeatedly urged Plaintiffs to continue those services in return for earning substantial compensation. As a direct and proximate result of Plaintiffs' efforts, Defendants' joint ventures earned millions of dollars of attorney fees.

171. Each of the Defendants have reaped substantial profits and/or will reap substantial profits from the clients which the Plaintiffs obtained for them through the Plaintiffs' services.

172. At all relevant times, when Defendants accepted, used and enjoyed the fruits of Plaintiffs' services, the Defendants knew or reasonably should have known that Plaintiffs expected to be paid a percentage of the Defendants' attorney fees for providing those services that were accepted, used and enjoyed by the Defendants.

173.  To the extent that any law renders any of the contracts and/or agreements between the Plaintiffs and the Defendants unenforceable due to illegality, the Defendants have greater culpability, and it would disserve the public interest to allow the Defendants to profit from their unjust conduct.

174.  Defendants have not paid the Plaintiffs the fees and expenses promised in return for the services that were provided, in good faith, by the Plaintiffs.  Each of the Defendants were thus unjustly enriched due to the efforts and services of the Plaintiffs.  Justice, good conscience, sound public policy, and/or applicable law require that Defendants not be thus unjustly enriched, and that Defendants be required to disgorge their ill-gotten gains earned at Plaintiff's expense and turn them over to the Plaintiffs to whom in good conscious they belong.

175.  Pursuant to the doctrines of Quantum Meruit and/or Unjust Enrichment, Plaintiffs, and each of them, are entitled to be compensated by the Defendants, jointly and severally, for all of the damages set forth throughout this Complaint.

### COUNT VI:  WAIVER AND EQUITABLE ESTOPPLE

176.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

177.  Plaintiffs, at all material times, reasonably believed and relied upon the representations of Pohl, stating on behalf of all Defendants and their respective joint ventures, that all of the processes, activities, contracts and agreements created, suggested and/or instituted by him were legal, proper and enforceable. Plaintiffs, at all material times, reasonably believed and relied upon the representations of Pohl, who stated on behalf of all Defendants and their respective joint ventures, that he had had the processes, activities, contracts and agreements described

herein approved by a Mississippi lawyer to ensure that that they were legal, proper and enforceable.  Plaintiffs reasonably believed and relied on those representations.

178.  As alleged with particularity above, Defendants' promises caused Plaintiffs, and each of them, to materially and substantially change their positions in reliance thereon.

179.  As described with particularity above, Plaintiffs' belief in and reliance upon the multiple representations and promises of the Defendants ultimately resulted in substantial damages to the Plaintiffs, and significant profits to the Defendants.

180.  To the extent that any of the Defendants assert as a defense that any contracts and/or agreements are unenforceable due to illegality, Defendants have waived that defense.

181.   Defendants are estopped from asserting that any of their contracts and/or agreements are unenforceable due to illegality.

182.  Defendants' acts and omissions are so egregious as to justify the application of the doctrines of equitable estoppel and waiver.  Defendants have effectively waived, and/or should be estopped from asserting, defenses they may otherwise have asserted to the claims of the Plaintiffs herein.

## **DAMAGES**

183.  By reference, each of the preceding paragraphs are adopted and made part of this section as if fully incorporated herein.

184.  As a direct and proximate result of the conduct, actions, inactions, and behavior of the Defendants, and each of them, as more fully set forth in the preceding paragraphs, Plaintiffs, and each of them, have suffered, and are entitled to receive from the Defendants, injuries and damages caused by the Defendants' misconduct.  The injuries and damages suffered by the

Plaintiffs, for which Defendants, jointly and severally, should be required to compensate the Plaintiffs, include, but are not limited to:

      a.  The agreed percentages of the attorney fees received by the Defendant's joint ventures, expressed in the contracts and/or agreements as a percentage of Pohl's profits from the joint ventures;

      b.  Pre-judgment and post-judgment interest on all amounts owed, calculated from the date Pohl received his attorney fee on each client, until  such amounts are paid in full;

      c.  Attorneys' fees and expenses, and incidental costs, incurred by the Plaintiffs, and each of them, for having to pursue litigation to enforce their rights under the subject Contracts, and each of them, all of which were foreseeable to the Defendants and which are necessary to accomplish the Mississippi Supreme Court's stated purpose in establishing a remedy for breach of contract claims, in an amount to be determined by a Jury and/or by the Court, and pre- and post-judgment interest thereon in the amount of 8% per annum;

      d.  Quantum meruit for the value of their services and all expenses incurred;

      e.  Disgorgement of the amount by which Defendants have been unjustly enriched, with payment of that amount to the Plaintiffs; and

      f.  All other damages to be shown at the trial of this matter.

185. Through each of the wrongful acts described above, Defendants, and each of them, have willfully and wantonly wronged the Plaintiffs, and each of them, or have treated them with such gross and reckless negligence, or in such a reckless disregard for their rights as is equivalent to such a wrong, and/or which rises to the level of an independent tort, as described above, thereby entitling the Plaintiffs to punitive damages in a sum to be determined by a Jury in this cause, in an amount which is sufficient to deter these Defendants, and others similarly situated,

from engaging in similar conduct in the future and to reward these Plaintiffs for bringing such conduct to light.  In the event Plaintiffs are awarded punitive damages, Plaintiffs are also entitled to recover additional attorneys' fees and expenses in a reasonable amount to be determined by the Court, as a matter of law.

186. WHEREFORE PREMISES CONSIDERED, Plaintiffs, and each of them, demand judgment against Defendants, and each of them, jointly and severally, for actual, compensatory, statutory and punitive damages, in an amount to be determined by a Jury in this cause and/or the Court, together with pre-judgment and post-judgment interest as provided by law, attorneys' fees and costs of this action, and any and all additional relief in favor of the Plaintiffs deemed appropriate by this Honorable Court.

Respectfully submitted this 17th day of March, 2016.

**PRECISION MARKETING GROUP, LLC**
BY ITS ATTORNEY:

*/s/ Tina L. Nicholson*
TINA L. NICHOLSON
MSB #99643

BAKER NICHOLSON, LLP
2402 Dunlavy Street
Houston, Texas 77006
Telephone: (713) 341-0030
Facsimile: (888) 244-2618
nicholson@bakernicholson.com

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of March 2016**,** I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>*/s/ Tina L. Nicholson*</u>

TINA L. NICHOLSON